**James P. DONAHUE, William J. Perez, and Harry J. Thornton, Plaintiffs,**

v.

**PENDLETON WOOLEN MILLS, INC., Defendant.**

**No. 84 Civ. 7149(RJW).**

United States District Court, S.D. New York.

March 21, 1986.

---

Wisehart & Koch, New York City, for plaintiffs; Arthur M. Wisehart, of counsel.

Schnader, Harrison, Segal & Lewis, New York City, for defendant; Thomas A. Greene, Nicholas N. Price, Martin Wald, of counsel.

## OPINION

ROBERT J. WARD, District Judge.

Three former sales representatives of Pendleton Woolen Mills ("Pendleton") have filed an action against the company charging that the manner of and motivation behind their termination violated the Age Discrimination in Employment Act (ADEA), as amended, 29 U.S.C. § 621 *et seq.*, the Sherman Act, 15 U.S.C. §§ 1 & 2, and unspecified state contract or common law rights. Pendleton moves under Rule 12(c), Fed.R.Civ.P., for judgment on the pleadings as to three of the four causes of action alleged in the complaint. Plaintiff cross-moves under Rule 15(a), Fed.R.Civ.P., to amend the complaint. As the following analysis will indicate, Pendleton has not established that plaintiffs cannot plead circumstances entitling them to recover on the claims alleged in the complaint, nor has Pendleton proved that those claims are entirely time-barred. Defendant's motion for judgment on the pleadings, therefore, is granted in part and denied in part without prejudice to its renewal as a motion for summary judgment after the completion of discovery. Plaintiffs' cross-motion for leave to amend the complaint is granted.

## BACKGROUND

For the purposes of this motion, the Court must accept the factual allegations of the complaint as true. In the complaint, plaintiffs allege the following. Pendleton Woolen Mills is an Oregon corporation which manufactures men's and women's wearing apparel and various other woolen goods. Pendleton employed James Donahue, William Perez, and Harry Thornton as members of the nationwide sales force it uses to service its retail dealers throughout the United States. Pendleton hired Donahue in 1959, Thornton in 1965, and Perez in 1971. All three plaintiffs claim to have

relied at the time they became Pendleton sales representatives "upon the representation, understanding, and custom and usage in the trade that they would continue to receive commissions at the rate of 5% of sales on the lines and in the territories assigned to them, that Pendleton would not unreasonably interfere with their ability to generate sales, and that they would not be terminated without good cause." Complaint at ¶ 29.

Within a nine month span from November 1982 to August 1983, and shortly after it implemented a new plan known as "Management by Objective," *id.* at ¶ 42, Pendleton terminated Donahue, who was then 52, Perez, who was then 53, and Thornton, who was then 56. Pendleton filled all three vacated positions with younger men. Plaintiffs assert that their unfavorable evaluations merely served as a pretext for their dismissals since Pendleton nonetheless retained other, younger sales representatives who had compiled poorer sales records.

Plaintiffs allege furthermore that Pendleton has resumed an illegal resale price maintenance agreement that had been the subject of an earlier investigation by the Federal Trade Commission ("FTC"). Following a 1979 investigation of certain marketing practices carried on by Pendleton, the FTC had furnished Pendleton with a copy of a draft complaint charging violations of the Federal Trade Commission Act ("FTCA"). Shortly thereafter, Pendleton entered into a consent order with the FTC that required the company, among other things, to cease maintaining, fixing, or enforcing resale prices for its products and to refrain from monitoring or sanctioning dealers who did not comply with pricing directives. *In re Pendleton Woolen Mills, Inc.*, 94 F.T.C. Decisions 229 (1979). Plaintiffs allege that despite the consent decree, Pendleton continues to survey resale prices, to coerce retail stores and sales representative to set and maintain retail prices decided by Pendleton, and to refuse Pendleton products to discounters.

Plaintiffs contend that through a system of threats and rewards, Pendleton forced its sales force to "do the dirty work or face reprisals" in implementing this retail price maintenance plan. Plaintiffs directly link their termination to the illegal scheme they describe by contending that "[o]n information and belief, Pendleton terminated the plaintiffs in part ... to make an example of them for those who refuse to actively participate in Pendleton's continuing violations." *Id.* ¶ 51.[1]

From the foregoing allegations, plaintiffs assert four causes of action. The first cause of action charges Pendleton with having embarked on a program to terminate its older sales personnel and replace them with younger employees in violation of the ADEA.[2] In the second cause of action, plaintiffs allege that Pendleton violated the antitrust laws in resuming activities that constitute a resale price mainte-

---

**1.** In their Proposed Amended Complaint, which plaintiffs have submitted in connection with their cross-motion for leave to amend the complaint discussed *infra,* plaintiffs elaborate considerably the operation of this scheme. Pendleton allegedly directly coerced its sales force by threatening to expose the sales representatives to criminal proceedings or jail. Proposed Amended Complaint at ¶ 50. Plaintiffs also allege that Pendleton used various means to sanction its sales force including shifting territory from non-cooperating representatives, subjecting them to disparagement, refusing them permission to carry other lines of clothing, interfering with their accounts, evaluating them harshly, dismissing some, and forcing others into early retirement. *Id.* at ¶ 60. Pendleton supposedly rewarded cooperative sales representatives with high evaluations, permission to carry other 1:clothing lines, and either the opportunity to operate competing stores or outright grants of interests in company retail stores. *Id.* at 59.

**2.** The Age Discrimination in Employment Act ("ADEA"), as amended, 29 U.S.C. §§ 621–634, requires as a prerequisite to a suit in federal court that plaintiff first present his claim to the Equal Employment Opportunity Commission ("EEOC") for an attempt at informal resolution, 29 U.S.C. § 626(d), and, in states such as New York whose law prohibits age discrimination, also to the administrative agency that can provide relief to the aggrieved individual, 29 U.S.C. § 633(b). Plaintiffs concededly commenced the appropriate actions before both the EEOC and the New York Department of Human Rights.

nance agreement. In the third count, which plaintiffs characterize as a claim for breach of contract, plaintiffs aver that Pendleton violated the terms and conditions of their employment and breached implied covenants of good faith dealing by terminating them. Plaintiffs maintain in addition that their wrongful terminations tarnished their reputations for reliability, dependability, and good service in their trade as sales representatives, therby destroying the goodwill the plaintiffs had built up over the years with their accounts. As a fourth, tort, cause of action, plaintiffs contend that "Pendleton disseminated false stigmatizing reasons for the actions taken against plaintiffs ... in reckless or grossly negligent disregard for the plaintiffs' rights, while concealing Pendleton's intentional violations of law as the underlying motivation of said actions...." *Id.* ¶ 57.

Pendleton moves under Fed.R.Civ.P. 12(c) for judgment on the pleadings on several grounds. First, Pendleton asserts that plaintiffs lack standing to assert the antitrust violations alleged in the second cause of action. Second, Pendleton contends that the fourth cause of action fails to state a claim upon which relief can be granted. Finally, Pendleton seeks to dismiss the second, third, and fourth causes of action at least in part as time-barred. Plaintiff cross-moves for leave to amend the complaint to add specific allegations concerning the operation on Pendleton's supposed resale price maintenance agreement and to include specific instances of derogatory statements made by Pendleton managers about plaintiffs. The Court will address *seriatim* defendant's objections to the original complaint and then will consider the amendments to the complaint that plaintiffs have proposed.

## DISCUSSION

### I. Motion for Judgment on the Pleadings

The Court may grant a motion for judgment on the pleadings only if it appears that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 61 (2d Cir. 1985); *George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,* 554 F.2d 551, 553 (2d Cir.1977).

### A. Antitrust Standing

Pendleton contends that the Supreme Court's most recent decision on antitrust standing, *Associated General Contractors of California, Inc., v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), dictates dismissal of plaintiffs' Sherman Act cause of action. Before examining the case law on antitrust standing, the Court will briefly recapitulate Pendleton's distribution system as it appears from plaintiffs' complaint, in order to visualize the layers in the market structure allegedly involved in this case. Pendleton manufactures clothing in competition with other makers. It distributes its products through retailers who in turn sell to the consuming public. Pendleton operates some of the retail stores directly and supplies as well other independent retailers. To reach the independent stores, Pendleton employs a sales force. The complaint alleges that at least some of the salesmen Pendleton employed or employs also carry the lines of other clothing manufacturers.

Plaintiffs' complaint suggests two different antitrust violations by Pendleton in connection with the distribution system described above. The first, which plaintiffs identify explicitly in the complaint, involves the resale price maintenance scheme allegedly conducted by Pendleton. The second, which is arguably implied by plaintiffs' allegations, concerns interference by Pendleton in the labor market for clothing salesmen. Each requires a distinct standing analysis.

### 1. Resale Price Maintenance Agreement

Resale price maintenance schemes operate to prevent price competi-

tion between the various dealers handling a given manufacturer's products. Generally in implementing such schemes, the manufacturer "suggests" an appropriate resale price and enforces dealer acquiescence in that price through some form of coercive sanction, which might range from delayed shipments to termination. *See* VII P. Areeda & D. Turner, *Antitrust Law* ¶ 1438–1442 (1986) ("VII Areeda & Turner"). Although such schemes directly coerce retailers, who must charge the price suggested by the manufacturer if they wish to continue carrying the product line, consumers ultimately pay the economic cost of such conduct in the higher prices set by the manufacturer. Resale price maintenance schemes are *per se* unlawful.[3] *Dr. Miles Medical Co. v. John D. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911) (minimum resale price); *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968) (maximum resale price).

 In the complaint, plaintiffs allege that Pendleton has resumed the activities first investigated by the FTC in 1979 and that those activities constitute an unlawful resale price maintenance agreement.[4] Plaintiffs further allege that Pendleton uses its sales force to implement the pricing system, to monitor dealer compliance with the system, and to sanction non-coop-

---

**3.** Not all discussions between a manufacturer and its distributors about prices amount to unlawful resale price maintenance agreements. Naked suggestions for resale prices unaccompanied by threats or sanctions for non-compliance create no legal problems even though most distributors ultimately comply with the suggestions. *Yeutsch v. Texaco,* 630 F.2d 46, 53 (2d Cir.1980); *see generally* VII P. Areeda & D. Turner, Antitrust Law (1986) ("VII Areeda & Turner") § 1440. A manufacturer may also dictate resale prices to its agents and enforce their compliance with such prices. Finally, manufacturers may freely select or terminate distributors, so long as they act independently in doing so.

Section 1 of the Sherman Act requires that there be a "contract, combination ... or conspiracy" between the manufacturer and other distributors in order to establish a violation. 15 U.S.C. § 1. Independent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently. *United States v. Colgate & Co.,* 250 U.S. 300, 307, 39 S.Ct. 465, 468, 63 L.Ed. 992 (1919); *cf. United States v. Parke Davis & Co.,* 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960). Under *Colgate,* the manufacturer can announce its resale prices in advance and refuse to deal with those who fail to comply. And a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination. *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). The Sherman Act prohibits only price-fixing agreements. "Thus the manufacturers strongly felt concern about resale prices does not necessarily mean that it has done more than the *Colgate* doctrine allows." *Id.* at 1470. A plaintiff must plead and prove an agreement as a necessary predicate to succeeding in an antitrust action alleging such an unlawful scheme.

Although a plaintiff may introduce circumstantial evidence to prove the agreement, in the "inference of such an agreement ... from highly ambiguous evidence, there is the considerable danger that the doctrine[ ] enunciated in ... *Colgate* will be seriously eroded." *Id.* Thus a plaintiff may not rely solely on actions by a manufacturer following complaints about price cutters, or actions that depended on information provided by distributors, but rather "must [supply] evidence that tends to exclude the possibility that the manufacturer and nonterminated distributor were acting independently." *Id.* at 1471. One commentator has suggested that evidence of "complex" as opposed to simple enforcement of announced conditions will support the necessary finding of an agreement. VII Areeda & Turner, *supra,* at § 1446, as will a finding of individualized negotiation or distributor admission of an agreement, *id.* at § 1447. Without passing on the sufficiency of such allegations, or that quantum of evidence that would likely be necessary to establish them at trial, the Court notes that in the amended complaint plaintiffs propose plaintiffs do allege an enforcement mechanism and other actions by Pendleton that far exceed the "simple" announcement of conditions for dealing followed by termination degree of enforcement permitted under Colgate, as recently reviewed in *Monsanto.* Plaintiffs, for example, would allege direct negotiations with discounters in which Pendleton sought assurances that they would bring their prices up to approved levels. Proposed Amended Complaint at ¶¶ 50, 51.

**4.** The Court reads plaintiffs' complaint to allege an unlawful resale price maintenance agreement and not, as defendant suggests, a violation of the 1979 consent decree. Accordingly, the Court need not consider the legal effect of the decree nor whether plaintiffs could properly sue Pendleton for violating the conditions of that decree.

erative dealers. Retailers and consumers affected by this conduct certainly would have standing to challenge such pricing arrangements. *Reiter v. Sonotone,* 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). The Supreme Court has not decided the precise question of whether employees who allegedly have been used to implement antitrust violations, such as the scheme alleged here, and who further allege that they have suffered direct injury flowing from the scheme have standing under the Clayton Act to sue their employer. Nonetheless, the considerations elaborated in the two most recent Supreme Court cases on antitrust standing and in the Second Circuit's interpretation of those cases leads this Court to conclude that plaintiffs have established standing to sue on the antitrust claim raised in the complaint.[5]

Section 4 of the Clayton Act, 15 U.S.C. § 15, permits "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" to sue in the federal district courts.[6] Despite the apparent sweep of this language, judicial interpretation has elaborated certain requirements a plaintiff must meet to have standing to bring an antitrust action. The Supreme Court most recently addressed questions of antitrust standing in *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982), and *Associated General, supra,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

In *McCready,* The Supreme Court summarized the development of two judicial "limitation[s] on the availability of the § 4 remedy to particular classes of persons and for redress of particular forms of injury." *McCready, supra,* 457 U.S. at 473, 102 S.Ct. at 2545. Courts refuse to find stand-

ing for particular plaintiffs when, for example, to do so would expose defendants to a threat of double recovery or when plaintiff sustains injuries "too remote" from the alleged antitrust violation. 457 U.S. at 474, 476–78, 102 S.Ct. at 2545–46, 2546–48.

*McCready* itself involved a plaintiff who belonged to Blue Shield of Virginia, a prepaid health plan to which her employer subscribed. Blue Shield is an association of participating physicians who sponsor and administer the plan. Under the terms of the plan, Blue Shield would reimburse members for psychiatric services, but would limit payments to psychologists to those billed through a supervising physician. Plaintiff sought treatment by a psychologist and submitted a claim for reimbursement. Blue Shield denied the claim. Plaintiff then faced the dilemma, as posed by the Court, of being reimbursed for a service she had not chosen or of paying for the treatment she preferred. 457 U.S. at 483, 102 S.Ct. at 2550. Plaintiff resisted the coercion and paid her psychologist herself. She subsequently brought a class action, alleging that Blue Shield and the Neuropsychiatric Society of Virginia, Inc. had engaged in an unlawful conspiracy, in violation of § 1 of the Sherman Act, to exclude psychologists from receiving compensation under the Blue Shield plan. Plaintiff made no allegations that the conspiracy had caused her to pay higher prices for the services of her psychologist. Plaintiff did allege that member psychiatrists had conspired with their agent Blue Shield to prevent or to limit the access of psychologists to the market for mental health services and that plaintiff, as a consumer of those mental health services, had standing the challenge the conspiracy.

---

5. *See generally* Note, *Employee Standing Under Section 4 of the Clayton Act,* 81 Mich.L.Rev. 1846 (1983) ("Michigan Note"). *Contra* Note, *Standing of the Terminated Employee Under Section 4 of the Clayton Act,* 25 Wm. & Mary L.Rev. 1341 (1983).

6. The Act provides further that such persons may sue "in any district court of the United

States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy...." 15 U.S.C. § 15. Pendleton does not dispute that, assuming plaintiffs have standing to sue under the antitrust laws, it may properly be sued in this district.

The Court in *McCready* analyzed the issue of plaintiff's right to sue in light of the applicable limitations on Clayton Act § 4 standing. Writing for the majority, Justice Brennan first found no danger of double recovery. 457 U.S. at 474–75, 102 S.Ct. at 2545–46. McCready rather than the psychologists had suffered the injury. Indeed, plaintiff's psychologist, who had been fully paid for his services, suffered no injury by virtue of Blue Cross' failure to reimburse the plaintiff. As the Court put it, "employees as subscribers ... are out of pocket as a consequence of the plan's failure to pay benefits." 457 U.S. at 475, 102 S.Ct. at 2546. Plan subscribers' damages, the Court concluded, stood apart from any that psychologists might allege in any suit of their own.[7]

Turning to the "conceptually more difficult question" of whether plaintiff had sustained injury too remote from the antitrust violation, the Court articulated a comprehensive inquiry to determine proximity.

> In applying that elusive concept [of proximate cause] to this statutory action, we look (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and (2), more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4.

457 U.S. at 478, 102 S.Ct. at 2547–48.

The Court immediately disposed of defendants' contention that only psychologists had been proximately injured by the defendants' purported conduct. That the goal of the conspirators was to prevent penetration of psychologists into that part of the mental health care market defendants sought to preserve did not necessarily render plaintiffs' injury remote.

> Denying reimbursement to subscribers for the cost of treatment was the very

means by which it is alleged that Blue Shield sought to achieve its illegal ends. The harm to McCready and her class was clearly forseeable; indeed, it was a necessary step in effecting the ends of the alleged illegal conspiracy. Where the injury alleged is so integral an aspect of the conspiracy alleged, there can be no question but that the loss was precisely "the type of loss that the claimed violations ... would be likely to cause."

457 U.S. at 479, 102 S.Ct. at 2548 (citations omitted). Because McCready had consumed psychotherapy services that should have been eligible for reimbursement, she acted or participated within that part of the market endanged by the breakdown of competitive conditions that resulted from Blue Shield's alleged policy of selective reimbursement. 457 U.S. at 481, 102 S.Ct. at 2549. That participation along with the foreseeability of harm to McCready satisfied the nexus requirement of the Court's proximity test.

■ McCready's injury furthermore satisfied the second requirement for proximity, that the injury reflect Congress' core concern to protect competition. The Court found that McCready's injury "was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market," and therefore fell "squarely within the area of Congressional concern." 457 U.S. at 484, 102 S.Ct. at 2551. Allowing McCready to redress the limitation on her choice by suing Blue Shield would thwart Blue Shield's use of its selective reimbursement policy allegedly as the means to limit access to the market for mental health services. In *McCready*, then, the Supreme Court broadened the group of plaintiffs who have antitrust standing beyond those encompassed by the various tests formerly employed by the circuits, including the Second Circuit's requirement that plaintiffs be in the target

---

**7.** Psychologists had suffered distinct injuries for which they also brought suit, but they could not claim the particular aspect of damage, the out of pocket payment to her psychologist, that McCready asserted. The Virginia Academy of

Clinical Psychologists filed a complaint similar to McCready's against the same defendants which the Virginia district court allowed to proceed. *McCready, supra,* 457 U.S. at 469 n. 4, 102 S.Ct. at 2543 n. 4.

area of the anticompetitive conduct. A plaintiff need no longer allege that the injury suffered reflects the direct and ultimately intended anticompetitive effect of the alleged violations as long as the plaintiff satisfies the proximity requirement by participating in some relevant fashion in the portion of the market endangered by the breakdown.

In *Associated General, supra,* 459 U.S. 519, 103 S.Ct. 897, the Supreme Court elaborated the analysis undertaken in *McCready.* Plaintiffs there, two construction unions, sued the Associated General Contractors of California, Inc. ("Associated"), a membership corporation composed of building and construction contractors. The unions and Associated had signed a collective bargaining agreement to govern the terms and conditions of employment contracts with union construction workers. Plaintiffs sued Associated alleging specific labor law violations and several antitrust causes of action. The antitrust claim at issue on appeal charged defendants with coercing (1) landowners or developers who were likely to hire general contractors, and (2) general contractors, who might be either members of Associated or their competition, to let their subcontracts to firms that employed non-union labor. 459 U.S. at 527–29, 103 S.Ct. at 902–04. The antitrust claim amounted to an assertion that Associated directly coerced or restrained members and other general contractors who, in turn, had employed subcontractors, some of whom employed union labor. The complaint did not allege any restraint in the market for labor union services, as might have been the case had Associated attempted to coerce the general contractors into favoring one union over another.

The Supreme Court in *Associated General* reversed the Ninth Circuit which had found standing on defendants' alleged intention to injure the unions and the resulting foreseeable harm. The Court again began its analysis under § 4 of the Clayton Act by reviewing the line of cases interpreting its reach, and focused particularly on the evolving concept of proximate cause. Although the Court found that the complaint alleged a causal connection between the antitrust violation and the unions' injury, as well as an intent to harm the union, it nonetheless found that other factors relevant to the question of antitrust standing dictated dismissal of the complaint in that instance. The five factors that comprised the Court's analysis included (1) the nature of the alleged injury, (2) the indirectness of the injury, (3) the existence of an identifiable class of persons whose self-interest would normally motivate them to bring the action, (4) the speculative nature of the damage claim, and (5) the potential complexity of accounting for damages resulting from defendants' behavior in order to avoid the possibility of double recovery. 459 U.S. at 545, 103 S.Ct. at 912. (summary).

Under the first prong of its analysis, the Court concluded that the nature of the unions' injury did not fall squarely within the area of Congressional concern. First, it was not clear to the Court whether the unions' interests would be served or disserved by enhanced competition in the market for general contractors, the market alleged to have been restrained. 459 U.S. at 539, 103 S.Ct. at 909. Second, the Court observed that Congress had responded directly to labor concerns by enacting and several times amending a comprehensive set of labor statutes to foster and protect the development of labor unions. Consequently, the Court found that "a union, in its capacity as bargaining representative, will frequently not be part of the class the Sherman Act was designed to protect, especially in disputes with employers with whom it bargains." 459 U.S. at 540, 103 S.Ct. at 909.

The attenuated connection between the unions' asserted injuries, unspecified harm to its business activities, and the alleged antitrust violation did not satisfy the second factor of the Court's analysis which required that the injury be direct. The unions averred injuries that resulted only indirectly and derivatively from the harm inflicted by the general contractors on certain subcontractors who were themselves

the object of the alleged coercion. 459 U.S. at 541, 103 S.Ct. at 910.

Those subcontractors subject to Associated's coercion sustained the more direct harm. They therefore constituted an identifiable group with sufficient interest to prosecute any antitrust violation on their own. 459 U.S. at 541, 103 S.Ct. at 910.

The indirect causal link between Associated's actions and the unions' alleged injuries to business activities made any determination of damages highly speculative. The complaint never alleged any concrete harm, as, for example, that the unions had lost any of their aggregate share of the subcontracting market or that Associated had conducted a boycott of union firms. 459 U.S. at 542, 103 S.Ct. at 910–11.

The fifth factor of the analysis in *Associated General* reflected the Supreme Court's earlier holding in *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977), that courts should limit the standing of more remote parties to avoid the necessity of litigating massive and complex damages issues which would be necessary in some instances to prevent double recovery. Drawing on that concern in *Associated General*, the Court pointed to the difficulty of determining the unions' injuries and to the burden of disentangling those damages from those that the subcontractors or general contractors had suffered. 459 U.S. at 543–45, 103 S.Ct. at 911–12. In light of these five factors, the Supreme Court concluded in *Associated General* that the unions there lacked standing.

Both *McCready* and *Associated General* disavowed the "target area" test that had previously been employed in several circuits, including the Second, to determine antitrust standing. Judge Friendly, writing for the panel in the first antitrust standing case to be presented to the Second Circuit after *Associated General*, advised that "courts of this circuit would be better, indeed are compelled, to follow the approaches adumbrated by the Supreme Court in *McCready* and *Associated General* without concern whether the results are consistent with language in earlier Second Circuit cases." *Crimpers Promotions, Inc. v. Home Box Office, Inc.*, 724 F.2d 290, 293 (2d Cir.1983), *cert. denied*, 467 U.S. 1252, 104 S.Ct. 3536, 82 L.Ed.2d 841 (1984). On the same subject, Judge Friendly noted as well the limited value of looking to or arguing from cases in other circuits decided prior to *McCready* and *Associated General. Id.* at 293 n. 2.

The circuit panel in *Crimpers* held that plaintiffs there had antitrust standing. The case involved the sale of cable television programming. As plaintiff's complaint described the market, independent television producers create programs which they sell either to the major networks or to the cable pay television companies. Plaintiff, a trade show operator, had sought to arrange a trade show to bring together in one place independent and network television producers with the cable system operators who might ultimately buy and broadcast television programs. The complaint further alleged that defendants Home Box Office ("HBO") and Showtime Inc. ("Showtime"), two companies that buy and package much of the independent programming, had dissuaded cable operators and producers from appearing at the trade show, had threatened to boycott producers who attended, and had described the show as a fraud to both cable operators and independent producers. 724 F.2d at 291. The trade show ultimately failed for lack of interest and attendance. Plaintiff sued, charging that HBO and Showtime dominated the cable pay television industry and had acted to monopolize the market for independent television programming in violation of § 1 of the Sherman Act.

Rather than try to integrate the two antitrust standing tests, Judge Friendly considered Crimpers' standing under *McCready* and *Associated General* in turn. Under the first *McCready* factor, Judge Friendly concluded that granting plaintiff standing would not permit double recovery. The profits lost on the trade show, the circuit panel held, would not in any manner overlap with the producers' losses from the

low prices offered for their products or the excessive cost and tying arrangement imposed on the cable system operators. 724 F.2d at 293–94.

Nor, under the second factor discussed in *McCready*, was Crimpers' injury remote. Because Crimpers had sought "to forge a link in a chain of the sale of programming, to wit, direct contact between program producers and cable television stations," and because it was alleged that the defendants directly intended to eliminate Crimpers, the circuit court held that "the injury to Crimpers was even more 'direct' than to the producers or stations," who concededly would have had standing. 724 F.2d at 294. Thus the court concluded that the requisite physical and economic nexus existed between defendants' alleged exclusionary acts in pursuit of a monopoly and the injury to plaintiff.

Moreover, given the directness of the injury, it followed as a matter of course that the injury fell within the ambit of Congressional concern. Defendants had conceded that the alleged activities, insofar as they affected producers or cable system operators were within the ambit of Congressional concern. The circuit court "[saw] no reason why Congress, had it considered the matter, would not have been equally concerned with protecting a company like Crimpers which undertook to create a business that would have mitigated the precise injury ... against which Congress sought to protect." 724 F.2d at 294. Defendants could not throttle a company trying to open a market which potentially would have obviated the need for their position as middleman and then hide behind an antitrust standing doctrine that they contended limited the right to sue to the producers and operators injured by the ultimately intended anticompetitive impact of their exclusionary actions.

Turning to *Associated General*, Judge Friendly concluded that Crimpers satisfied the factors identified there as well. Focusing first on the nature of plaintiff's injury, Judge Friendly analogized Crimpers' alleged harm, which supposedly had resulted from defendants' antitrust conspiracy to prevent direct dealing between cable operators and producers, to the harm McCready had asserted, which stemmed directly from defendants' attempt to limit entrance into the market for mental health services. The conduct causing injury to both plaintiffs contravened the intent of the Sherman Act to assure customers the benefit of price competition. Plaintiffs' injuries thereby implicated the central interest of the antitrust laws in protecting the economic freedom of market participants. 724 F.2d at 296. Congress had provided no alternative method of redressing this anticompetitive conduct, as it had in the form of the labor laws for defendants' acts in *Associated General*.

Turning to the directness of the injury, the court further found that defendant's efforts toward limiting face-to-face transactions between producers and cable system operators by disrupting plaintiff's trade show directly harmed the plaintiff. Crimpers did not allege an attenuated injury such as that asserted by the unions in *Associated General* which derived from the direct harm to unionized contractors and subcontractors. Crimpers, therefore, was in no way "remote" from the market affected by defendants' conduct. 724 F.2d at 296.

Next, the circuit panel considered whether there were other groups that might have cause to challenge defendants' conduct. Despite the existence of at least two classes of potential plaintiffs, the cable system operators and the independent producers, who might also have an incentive to challenge defendants' actions, the court granted Crimpers standing. The producers and cable system operators, the court surmised, could only speculate as to the damages they might have suffered from the failed trade show and therefore only Crimpers would have standing to allege the injury caused by the trade show boycott. 724 F.2d at 297. Moreover, calculating damages would present no real obstacle. If the plaintiff were to succeed in the case, Judge Friendly found, the district court

would ascertain damages under commonly accepted antitrust principles. Finally, the court saw no difficulty in distinguishing the damages Crimpers suffered from those otherwise inflicted on the producers and the cable system operators. 724 F.2d at 297.

*McCready, Associated General,* and *Crimpers* all point toward finding standing in the instant case. In the first place, the suit presents no prospect of the double recovery that concerned the Supreme Court in *Illinois Brick, supra,* and which forms the initial inquiry under *McCready.* Plaintiffs here allege loss of employment and commissions, damage to their professional reputations, and resulting emotional distress. None of those alleged injuries overlap with the economic injuries that would have been suffered by discount houses also victimized by the resale price agreements plaintiffs allege. Similarly, plaintiffs' purported losses do not duplicate consumer losses resulting from the higher prices that may ultimately have been paid for Pendleton products as a consequence of defendant's price maintenance scheme.

▇ Plaintiffs' asserted injuries are not remote. As indicated above, *McCready* broadened the group of plaintiffs who have antitrust standing beyond those in the target area of the alleged anticompetitive conduct. Plaintiffs need not aver that the injury they suffered reflects the intended anticompetitive effect of the alleged antitrust violation as long as they participated in the portion of the market endangered by the purported breakdown of competition in some relevant fashion sufficient to meet the proximity test.

Under the first part of *McCready*'s proximity analysis, the complaint here alleges a close "physical and economic nexus" between the antitrust violation claimed—the implementation of the resale price maintenance agreement—and plain-

tiffs' injuries—their termination as an example to other sales representatives to cooperate. The complaint describes the central role of Pendleton's sales force in imposing the averred resale price maintenance agreement on Pendleton retailers. The resale price maintenance agreement that plaintiffs allege required the cooperation, voluntary or otherwise, of the Pendleton sales representatives. It is reasonable to assume that Pendleton could have foreseen reluctance to participate on the part of those of the sales representatives who recognized the program's illegality. Pendleton faced the choice either of securing cooperation through threats or of terminating recalcitrant representatives.[8] Coercing these plaintiffs and the rest of the sales force into implementing the scheme "was the very means by which it is alleged that [Pendleton] sought to achieve its illegal ends. ... [I]ndeed, it was a necessary step in effectuating the ends of the alleged illegal conspiracy." *McCready, supra,* 457 U.S. at 479, 102 S.Ct. at 2548. As they allege the scheme, the sales representatives were the very instrument Pendleton wielded to accomplish its ends.

*McCready,* in the second prong of its proximity analysis, further emphasized that the injury inflicted on the plaintiff must be of a type that Congress would have sought to redress. Read together, *McCready* and *Crimpers* point out the interdependence of the proximity inquiries. The two cases suggest that when the complaint describes a sufficiently tight nexus under the first prong, as when injuring the plaintiff is the means of perpetrating the ultimate constraint on competition or where injuring the plaintiff prevents plaintiff from alleviating restraints on competition, the conclusion of Congressional concern follows as a matter of course, unless, as in *Associated General,* Congress has already provided specific redress for the harm al-

---

**8.** The absence of specific intent on the part of Pendleton to harm its sales representatives does not determine the standing question. As the Supreme Court held, "[t]he availability of the § 4 remedy to some person who claims its benefit is not a question of the specific intent of the

conspirators. Here the remedy cannot reasonably be restricted to those competitors whom the conspirators hoped to eliminate from the market." *McCready, supra,* 457 U.S. at 479, 102 S.Ct. at 2548 (quoted in *Associated General, supra,* 459 U.S. at 537, 103 S.Ct. at 908).

leged by the plaintiff in another body of law.

Plaintiffs in the instant action do not allege either that they consume appreciable quantities of Pendleton products or that they produce competing merchandise. They nonetheless occupy a position similar to that of McCready and Crimpers. As had defendants in *McCready*, Pendleton used plaintiffs as the very means of enforcing the alleged scheme to restrain competition. In this important respect, plaintiffs plead a tighter nexus between their harm and Pendleton's conduct than do either the affected retailers or other manufacturers, two groups who would also have standing. Although plaintiffs here were not working to create an alternative market, as was Crimpers, granting them standing deprives defendant of its easiest method of pursuing its alleged objective of setting retail prices. Because plaintiffs claim to be the very means by which Pendleton imposed the resale price maintenance scheme and because plaintiffs' terminations are the sort of injury that enforcing the alleged antitrust violation at issue would entail, the Court concludes that the harm is one with which Congress would be concerned.

That plaintiffs also allege wrongful termination claims under the ADEA does not undercut the argument for antitrust standing. The ADEA addresses only one of a myriad of possible wrongful termination claims. Congress has enacted no comprehensive statutory scheme to cover at will employment relations similar in scope to that which governs union relations with employers.

A straightforward analysis using the factors announced in *Associated General, supra,* 459 U.S. 519, 103 S.Ct. 897, plainly points toward finding standing as well. As discussed above under proximity, the nature of plaintiffs' alleged injuries implicates Congress' "central interest in protecting the economic freedom of participants in the relevant market." 459 U.S. at 538, 103 S.Ct. at 908.

As alleged, plaintiffs' injuries stem directly from Pendleton's purported actions in implementing and enforcing its resale price maintenance scheme as required by the second factor of *Associated General.* Plaintiffs stood in a direct employer-employee relationship with Pendleton. This relationship contrasts with the sort of derivative relationship, as, for example, that of a supplier to an antitrust victim or that of a product or process licensor to a boycott victim, that courts have held will not support antitrust standing.

The third factor in *Associated General* looks to the existence of other groups with sufficient motivation to sue. In the posture of this case, the discount stores boycotted by Pendleton and perhaps even certain consumers might have sufficient motivation to bring an antitrust action. Nonetheless, the existence of the independent producers and the cable system operators in *Crimpers,* two identifiable groups also potentially so motivated, did not prevent the Second Circuit from finding standing as to the plaintiff in that case. Neither discount stores nor consumers would have standing to assert the distinctive claims of damages sought by plaintiffs. In addition, terminated employees such as the plaintiffs here may well have a stronger interest in seeking redress than would retailers who may also have been harmed by defendant's purported conduct.[9] The Supreme Court's concern in *Associated General* about extending standing to ever more remote parties simply is not presented on the allegations before the Court because plaintiffs directly participated in the clothing market involved and, as Pendleton employees, plaintiffs were of necessity intimately involved with at least some of the details of the resale price maintenance scheme.

The fourth factor in *Associated General* concerns whether a plaintiff's claim would force the court to speculate about damages. Computing plaintiffs' lost earnings in this action poses fewer difficulties than would estimating the profits Crimpers expected to make from the planned trade

---

**9.** *See* Michigan Note, *supra,* at 1864–65.

show, an exercise which the Second Circuit found "should be proveable under the liberal principles long recognized in antitrust cases." *Crimpers, supra,* 724 F.2d at 297. Plaintiffs' claims for lost income involves no more speculation than that used to determine future income in other wrongful termination actions with which federal courts are familiar.

Finally, as discussed in a prior portion of this analysis, plaintiffs' complaint presents no danger of double recovery under the fifth factor of *Associated General.* All five factors, with the possible exception of the existence of other classes of plaintiffs with motivation to sue which the circuit court in *Crimpers* held not to be controlling, standing is appropriate.

The Ninth Circuit, the only other circuit that has addressed the question of employee standing to assert an antitrust claim for termination for refusal to participate in illegal antitrust actions subsequent to both *McCready* and *Associated General* reached a similar conclusion. *Ostrofe v. H.S. Crocker Co, Inc.,* 670 F.2d 1378 (9th Cir.1982), *vacated,* 460 U.S. 1007, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983), *on remand* 740 F.2d 739 (9th Cir.1984), *cert. dismissed,* — U.S. — 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985). The plaintiff in *Ostrofe,* a former marketing director of the defendant, alleged that the company had terminated him when he refused to rig bids, fix prices, and allocate markets in the paper lithograph label market. He further alleged that he was boycotted from any further employment in the business. 740 F.2d at 741–42. Applying the Supreme Court's standing analysis in *McCready* and *Associated General,* the Ninth Circuit held that the plaintiff there had standing to sue his former employer under the antitrust laws.

Of particular relevance to the standing question posed in the instant case is the Ninth Circuit's discussion of Ostrofe's injury and its relation to the antitrust violations he was alleging. The court first considered whether plaintiff had suffered antitrust injury, as defined by the Supreme Court in *McCready,* and found that he had.

The rationale of *Blue Shield* favors Ostrofe's right to sue. The Court's refusal to limit recovery to those whose injuries resulted from the anti-competitive effect of the violation undercuts conceptual objections to allowing suit by an employee discharged for refusing to effectuate an antitrust violation. The Court's extension of the right to sue to persons whose injury is a "necessary step" and the "means" employed by the conspirators to achieve their anticompetitive end provides a principled basis for recognizing Ostrofe's right to sue.

\* \* \* \* \* \*

As sales manager of one of the label manufacturers, Ostrofe was an essential participant in the scheme to eliminate competition in the marketing of labels by fixing prices and allocating customers. It could not succeed without his active cooperation. When Ostrofe sold labels to customers not allocated to his employer and at prices below those agreed upon, his discharge was a necessary means to achieve the conspirators' illegal end as well as an integral and inextricable part of the anticompetitive scheme.

740 F.2d at 745–46. Ostrofe's position, the Ninth Circuit concluded, therefore satisfied the requirement that he plead antitrust injury.

Although Ostrofe was not a competitor or consumer in the labels market, the injury he sustained was such an integral part of the scheme to eliminate competition in that market as to constitute "antitrust injury" as that concept is developed in *Blue Shield.*

740 F.2d at 746.

This Court sees no principled way to distinguish Ostrofe from plaintiffs in the present case. All stood in the same employer-employee relationship, alleged that they suffered injury as a result of their employer's alleged attempt to violate the antitrust laws, and furthermore had been the very method by which the employer attempted to manipulate the markets involved.

Defendants' attempt to rely on contrary circuit precedent of the Seventh Circuit or on any of the number of district court cases cited in their brief is misplaced. The Seventh Circuit decided the case of *In re Industrial Gas Antitrust Litigation,* 681 F.2d 514 (7th Cir.1982), *cert. denied* 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983), on June 25, 1982, only four days after *McCready* was handed down and before the Supreme Court's decision in *Associated General.* In deciding the issue of employee standing, the Seventh Circuit employed a three-step test, looking to (1) whether the plaintiff had suffered "antitrust injury," (2) whether the injury flowed from that which makes defendants acts unlawful, and (3) whether the plaintiff would be the proper party to bring the action. 681 F.2d at 515. The circuit court

disposed of the standing question before it by deciding that plaintiff had suffered no "antitrust injury," but did so on the basis of the now superseded target area test for determining antitrust injury, at test that required plaintiff be the actual target of the alleged conspiracy. The court did consider the Ninth Circuit's first opinion is *Ostrofe, supra,* 670 F.2d 1378, but rejected its result. In so doing, the Seventh Circuit held that (1) section 4 protects only injuries to consumer or competitors in the defined target market and (2) that Congress was not concerned with employee coercion or discharge unless it is directly related to the scheme's anticompetitive effects. 681 F.2d at 519. In light of *McCready* and *Associated General,* this circuit has explicity rejected both of those rationales.[10] *See Crimpers, supra,* 724 F.2d at 296. Absent

10. Even without the Second Circuit's suggestion that cases decided prior to *Associated General* and *McCready* provide little useful guidance, the Court would note that the cases argued by Pendleton provide at best only mixed support for its position. The Third Circuit in *Bravman v. Bassett Furniture Industries, Inc.,* 552 F.2d 90 (3rd Cir.1977), upheld standing for a terminated sales representative who alleged antitrust violations against the furniture manufacturer whose goods he sold. Although the circuit court there upheld a jury verdict for the plaintiff on the basis that plaintiff had in fact competed with the defendant following his termination, the court acknowledged at the same time "that § 4 standing analysis is essentially a balancing test comprised of many constant and variable factors and that there is no talismanic test capable of resolving all § 4 standing problems." 552 F.2d at 99. In making that observation, the court declined to accept the defendant's characterization of precedent in the Third Circuit as limiting standing to competitors only. 552 F.2d at 100. The circuit court furthermore specifically rejected the defendant's attempt to analogize the position of the sales representative plaintiff to that of either the officers or stockholders of a corporate antitrust victim, 552 F.2d at 97, or that of a lessor to such a corporate victim, 552 F.2d at 98–99, arguments that Pendleton has urged upon this Court.

Both *McNulty v. Borden Inc.,* 542 F.Supp. 655 (E.D.Pa.1982), and *Booth v. Radio Shack Division, Tandy Corp.,* 1982–83 Trade Cas. ¶ 65,001 (E.D.Pa.1982), two cases on which Pendleton also relies, involved employee claims against their former employers for alleged violations of the Robinson-Patman Act, 15 U.S.C. § 13 *et seq.* In both cases, the district courts looked to the

purposes of the Robinson-Patman Act to determine whether the plaintiffs' protection was a fundamental purpose of the antitrust law at issue. In both case, the courts found the primary purpose of the Robinson-Patman Act to be to protect purchasers and competitors, not employees, and therefore the courts denied standing to plaintiffs on that ground. That analysis would not necessarily dictate the same result for Sherman Act violations.

The court in *McNulty* further noted that it was "not unmindful of the weighty policy considerations recently put forth by the Ninth Circuit in granting standing to an employee fired for refusing to carry out policies allegedly violative of § 1 of the Sherman Act [in *Ostrofe I*]," 542 F.Supp. at 661, but felt constrained in that case by Third Circuit precedent requiring that injury directly result from the economic effects of the alleged violation. *Cf. Callahan v. Scott Paper Co.,* 541 F.Supp. 550, 560–61 (E.D.Pa.1982) (in denying standing to employee plaintiff in suit brought under Robinson-Patman Act, court expressed opinion that *Ostrofe I* was wrongly decided). It is worth noting that another court within the Third Circuit, also employing the *Bravman* balancing test discussed above, granted antitrust standing to a terminated employee. *Shaw v. Russel Trucking Line, Inc.,* 542 F.Supp. 776, 780–81 (W.D.Pa.1982). The district court in *Shaw* found that the plaintiff's injury flowed immediately and directly from his termination allegedly for refusing to participate in what the court assumed were Sherman Act violations. 542 F.Supp. at 780–81. The court in *Shaw* explicitly adopted the Ninth Circuit's assessment of relevant policy considerations in *Ostrofe I* in reaching its conclusion that terminated employees have standing to sue under the antitrust laws. 542 F.Supp. at 780.

those conceptual underpinnings, Pendleton's arguments that plaintiffs' status as employees automatically renders their injuries remote must fail.

### 2. Direct interference in the service market

■ An employee who is the target of a boycott of his or her services that is part of a larger conspiracy to restrain or monopolize trade and commerce may challenge the conspiracy as a whole even though the injuries did not result from the restraint on competition that was the principal object of the conspiracy. *Radovich v. National Football League,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 445 (1957). *Radovich* involved an alleged agreement among defendant football teams to blacklist the plaintiff because he had played for a rival professional football league. The defendants purportedly had utilized the player boycott as the means by which to destroy the rival league, the object of the overall conspiracy to monopolize professional football. The Supreme Court decided that Radovich had standing to challenge the conspiracy to monopolize of which the boycott was a part. Nothing in *McCready* or *Associated General* casts doubt on the continued vitality of this line of cases. *See Ostrofe, supra,* 740 F.2d at 742–43.

As will be elaborated below, plaintiffs' fourth cause of action sounds in common law tort. Plaintiffs propose to amend their fourth claim to allege specifically that Pendleton made and published defamatory statements with the purpose and intent of "deter[ring] individuals, firms and accounts with whom plaintiffs seek to do business from dealing with plaintiffs." Proposed Amended Complaint at ¶ 76. Plaintiffs would further allege that Pendleton disseminated the "false stigmatizing reasons" for plaintiffs' termination to "conceal[ ] Pendleton's intentional violations of law as the underlying motivation of said action...." *Id.* at ¶ 69. Although hardly a model of clarity as an antitrust claim, plaintiffs fourth cause of action in its proposed amended form would also support antitrust

standing under the *Radovich* line of cases alluded to above. Consistent with the Court's decision, *infra,* to permit plaintiffs to amend the complaint in conformity with this opinion, plaintiffs will be permitted, although they are by no means required, to amend their antitrust allegations to include an employee boycott claim such as that sustained in *Radovich.*

### B. Plaintiff's Fourth Cause of Action

Pendleton contends that in its present form plaintiffs' fourth cause of action states no claim upon which relief may be granted. The crux of plaintiffs' fourth cause of action, it would appear, is that "Pendleton disseminated false stigmatizing reasons for the actions taken against the plaintiffs ... in reckless or grossly negligent disregard for the plaintiffs rights ... causing great and substantial pain and suffering." Complaint at ¶ 57. Defendant argues that the fourth claim, as originally pleaded, states no cause of action either in defamation or *prima facie* tort. In their proposed amended complaint, plaintiffs repeat the allegations of the original and aver in addition that Pendleton maliciously intended to injure plaintiffs in their trade or business. Proposed Amended Complaint at ¶ 72. The proposed amendments refer to specific incidents of defamation plaintiffs contend they uncovered through discovery. *Id.* ¶¶ 70–76. These include defamatory statements allegedly made at a sales meeting in Portland, Oregon on January 30, 1985, and to various Pendleton accounts during an October 1984 tour of the northeast by Pendleton managers. Plaintiffs do not allege in the proposed amended complaint that Pendleton's managers mentioned them by name at the Portland meeting, but they assert that from the circumstances of the statements, those present at the meeting understood defendant's managers to be referring to plaintiffs. *Id.* ¶ 71.

### 1. Defamation

To establish a *prima facie* case of defamation, plaintiff must plead that defendant (1) negligently or willfully uttered a (2)

defamatory statement (3) of or concerning the plaintiff (4) to a third person (5) which resulted in damage to plaintiffs' reputation. *See National Nutritional Foods Ass'n v. Whelan,* 492 F.Supp. 374 (S.D.N.Y.1980). Although not mentioned by name, plaintiff, through colloquium, may plead extrinsic facts that indicate that a reasonable listener would believe that the statement concerned them. *Blowers v. Lawyers Coop. Publishing Co.,* 44 A.D.2d 760, 354 N.Y. S.2d 239 (4th Dep't 1974). The original complaint on its face does not sufficiently allege either the utterance of a defamatory statement or damage to plaintiffs' reputation. It therefore fails to state a cause of action in defamation.

### 2. *Prima Facie* Tort

■ To state a cause of action for *prima facie* tort, plaintiffs must assert that defendant inflicted intentional harm by an act or series of acts otherwise lawful and that defendants conduct resulted in damages to plaintiffs. *Sadowy v. Sony Corp. of America,* 496 F.Supp. 1071, 1074 (S.D.N. Y.1980); *Sommer v. Kaufman,* 59 A.D.2d 843, 844, 399 N.Y.S.2d 7, 8 (1st Dep't 1977). To successfully plead a cause of action in *prima facie* tort, plaintiffs in addition must allege that defendant was motivated solely by a desire to injure the plaintiff. *Marcella v. ARP Films, Inc.,* 778 F.2d 112 (2d Cir.1985); *Korry v. International Telephone & Telegraph Corp.,* 444 F.Supp. 193, 195 (S.D.N.Y.1978); *Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co.,* 7 A.D.2d 441, 184 N.Y.S.2d 58, 61 (1st Dep't 1959). As one court in this circuit noted, however, New York law is unclear on whether a cause of action in *prima facie* tort must be dismissed when the other motive is illegal or involves covering up illegality. *Sadowy, supra,* 496 F.Supp. at 1075. The complaint in this action alleges only that Pendleton acted in reckless disregard of plaintiffs rights, not that by its actions Pendleton intended no other result than that plaintiffs should be injured. The complaint, therefore, fails to state a cause of action in *prima facie* tort.

Because the fourth cause of action insufficiently alleges either defamation or *prima facie* tort, the court must grant defendant's motion for judgment on the pleadings. As noted *infra,* plaintiffs are granted leave to replead. The Court will not here pass on the sufficiency of the allegations of the proposed amended complaint to support an action in either defamation or *prima facie* tort. The Court would, however, note that an action in *prima facie* tort will not lie where the allegations of the complaint contain the elements of a traditional tort. *Belsky v. Lowenthal,* 62 A.D.2d 319, 405 N.Y.S.2d 62, 64 (1st Dep't 1978), *aff'd mem.,* 47 N.Y.2d 820, 392 N.E.2d 560, 418 N.Y.S.2d 573 (1979). Plaintiffs may plead their claims in the alternative, *Board of Educ. of Farmingdale v. Farmingdale Classroom Teachers Assoc., Inc.,* 38 N.Y.2d 397, 343 N.E.2d 278, 380 N.Y.S.2d 635, 645 (1975), but must do so as separate causes of action.

### C. Statutes of Limitations

Pendleton argues that even if the Court declines to dismiss the second, third, and fourth causes of action for failure to state a claim, that those claims nonetheless must be dismissed as untimely to the extent they allege acts or violations falling outside the applicable statutes of limitations.

### 1. Antitrust Claim

■ Although applying the federal statute of limitations in any given situation may present difficulty, the applicable legal principles are not at all complex. Section 4B of the Clayton Act imposes a four year statute of limitations on antitrust suits brought by private parties. 15 U.S.C. § 15b. An antitrust cause of action accrues and the statute of limitations begins to run when the defendant commits an act that injures the plaintiff. *Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). An overt act committed more than four years prior to the filing of the complaint whose effects were first felt outside the limitations period, therefore, will not

usually support a cause of action even if the effects persist into the limitations period. Exceptions exist for damages that would have been too speculative to recover at the time plaintiff filed suit, *id.* at 339, 91 S.Ct. at 806, and for damages resulting from an act outside the four year period whose effects first were felt within the statutory period, *Brager & Co., Inc. v. Leumi Securities Corp.*, 429 F.Supp. 1341, 1349 (S.D.N.Y.1977), *aff'd*, 646 F.2d 559 (2d Cir.), *cert. denied*, 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 845 (1981). In the context of a continuing antitrust conspiracy, such as the ongoing resale price maintenance agreement alleged in this action, "[the general limitations rule] has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute of limitations runs from the commission of the act." *Zenith Radio Corp, supra*, 401 U.S. at 338, 91 S.Ct. at 806.

### a. Tolling by Government Proceedings

 Section 5(b) of the Clayton Act suspends the running of the statute of limitations during the pendency of a civil or criminal proceeding by the United States as to private actions based in whole or in part on any matter complained of in the government proceeding. 15 U.S.C. § 16(i). The statute specifically provides, however, "[t]hat whenever the running of the statute of limitations in respect of a cause of action arising under section 4 or 4C is suspended hereunder, any action to enforce such cause of action shall be forever barred unless commenced either within the period of suspension or within four years after the cause of action accrued." *Id.* This clause requires but little interpretation. FTC proceedings under the Sherman and Clayton Acts are given the same tolling effect as those of the Department of Justice. *Minnesota Mining & Mfg. Co. v. New Jersey Wood Finishing Co.*, 381 U.S. 311, 321–22, 85 S.Ct. 1473, 1478–79, 14 L.Ed.2d 405 (1965).

As noted earlier, in 1979, the FTC provided Pendleton with a copy of a draft complaint charging violations of the FTCA. Plaintiffs argue that the pendency of this FTC investigation in 1979 tolled the statute of limitations. In the instant action, the Court need not decide whether the rational advanced by the Supreme Court in *Minnesota Mining & Mfg. Co., supra*, 381 U.S. 311, 85 S.Ct. 1473, extends to FTC proceedings under § 5 of the FTCA, 15 U.S.C. § 45, concerning unfair methods of competition as well.[11] Nor need the Court decide whether the FTC proceeding at issue here remained pending during the sixty days after the filing of the consent order during which Pendleton could have appealed its terms.[12] Even assuming that FTC proceedings under the FTCA merit the same effect as FTC proceedings under the Sherman Act, and further assuming that proceedings continued pending during the sixty-day appeal period, plaintiffs have still fallen woefully short of gaining the benefit of the period during which the FTC investigated Pendleton.

---

11. Without deciding the question, the Court notes that the weight of authority and policy lean toward according FTCA proceedings the same tolling effect as government proceedings under the Clayton and Sherman Acts. Indeed, FTC actions under 15 U.S.C. § 45 may concern conduct that also violates the Sherman or Clayton Acts. *See Rader v. Balflour*, 440 F.2d 469 (7th Cir.1971); *see also Wendkos v. ABC Consolidated Corp.*, 379 F.Supp. 15, 22 (E.D.Pa.1974); *In re Antibiotic Antitrust Actions*, 333 F.Supp. 317, 320 (S.D.N.Y.1971) (look to acts underlying proceeding); *Lippa's Inc. v. Lenox Inc.*, 305 F.Supp. 182, 185–88 (D.Vt.1969). For purposes of determining the limitations period on plaintiffs' antitrust claim, therefore, the Court will accept the reasoning of the Fourth Circuit in *Rader* as persuasive, and will assume that the FTC proceeding at issue here should be given the same tolling effect as would a proceeding brought under the Clayton or Sherman Acts.

12. Accepting plaintiffs' contentions and further assuming the consent order was filed on July 31, 1979, the date that appears on the order itself, the action could have remained pending only until October 1, 1979. Plaintiffs would have to have brought suit by October 1, 1980 to gain any advantage from the pendency of the FTC proceeding even under this tolling theory. This they failed to do.

Plaintiffs commenced this action on October 3, 1984. Section 5(b) allowed plaintiffs to bring suit either within one year of the termination of the government proceeding or within four years after the accrual of the cause of action. The prior government suit has no effect with respect to private suits filed more than one year after termination of the government action. *Philco Corp, v. Radio Corp.*, 186 F.Supp. 155, 161 (S.D.N.Y.1960). To benefit at all from the pendency of the FTC proceedings, even by their own accounting, plaintiffs would have had to bring the instant action by October 30, 1980. Plaintiffs can sue for damages based on any acts that occurred after October 3, 1980 or for acts that occurred before October 3, 1980 if their effects first manifested themselves after that date.[13] The Court recognizes the potential uncertainty of determining precisely when plaintiffs may first have felt latent harm from the alleged overt acts of Pendleton. Nonetheless, many of the claimed damages, such as those for shifts in territory dating back to 1962, resulted from events whose effects must surely have first manifested themselves before October 3, 1980 and which would therefore be time-barred. The Court, therefore, grants Pendleton's motion for judgment on the pleadings as to those events. Plaintiffs' amended complaint shall reflect this limitation.

b. Duress as Tolling

 Plaintiffs argue in addition that the Court should hold the statute of limitations tolled by "duress to which defendant subjected plaintiffs in furtherance of its illegal scheme to fix retail prices." Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion to Dismiss and in Support of Plaintiffs' Cross-Motion to Amend the Complaint at 31. Plaintiffs' argument, however, overlooks the very narrow role

allowed duress for purposes of tolling the statute of limitations in antitrust actions.

By their essence, antitrust violations involve coercion. For this Court to accept plaintiffs' argument, that the duress inherent in the resale price maintenance scheme they allege effectively tolled the statute of limitations, would preclude the application of any limitation to an ongoing antitrust violation in which plaintiffs could plausibly allege some aspect of coercion in the underlying scheme. *See Kaiser Aluminum & Chemical Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1056–57 (5th Cir.1982), *cert. denied*, 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). Plaintiff has cited, and the Court is aware of, no relevant cases in which duress implicit in the antitrust violation itself has been held to toll the statute of limitations. *See Cooper v. Fidelity-Phila. Trust Co.*, 201 F.Supp. 168, 170 (E.D.Pa.1962) (alleged threats to commit plaintiff did not constitute duress); *Philco Corp. v. Radio Corp. of America, supra*, 186 F.Supp. at 161–62 (where no acts of duress alleged, mere anticipation of duress insufficient as a matter of law to toll limitations period); *Miller Motors Inc. v. Ford Motor Co.*, 149 F.Supp. 790, 794 (M.D.N.C.1957) (no duress in threat to terminate dealership).

Plaintiffs do not allege that Pendleton exerted any coercion on them either before or after their separation to prevent them from filing the instant suit. All three plaintiffs sought permission in an administrative proceeding before the EEOC to file private age discrimination suits. Plaintiff Thornton began his administrative proceeding even before Pendleton had terminated him. Because plaintiffs have not alleged any coercion other than that implicit in the alleged resale price maintenance scheme, the Court cannot accept plaintiffs' arguments

---

**13.** In square contradiction to the express wording of the statute, plaintiffs would have the Court stretch the statute of limitations by tacking together the four years of 15 U.S.C. § 15(b), the time during the pendency of the FTC investigation, *and* the one year following the termination of the proceeding. The Second Circuit, in an opinion by Judge Hand, long ago rejected just such a whimsical reading of the statute. *Herman Schwabe, Inc. v. United Shoe Machinery Corp.*, 274 F.2d 608, 610 (2d Cir.1960), *cert. denied* 363 U.S. 811, 80 S.Ct. 1247, 4 L.Ed.2d 1153 (1960); *see also Stewart Aviation Co. v. Piper Aircraft Corp.*, 372 F.Supp. 876, 878 (M.D. Pa.1974); *Fleisher v. A.A.P. Inc.*, 180 F.Supp. 717 (S.D.N.Y.1959), *aff'd*, 329 F.2d 424 (2d Cir.1964).

for tolling the statute on the basis of duress.

### c. Fraudulent Concealment

██ Finally, plaintiffs maintain that the relevant limitations period should be tolled to account for Pendleton's fraudulent concealment of facts indicating that plaintiffs had an antitrust cause of action. A plaintiff who seeks to invoke the doctrine of fraudulent concealment must plead and prove (1) the wrongful concealment by the defendant of its actions, (2) the failure by the plaintiff to discover the operative facts underlying the action within the limitations period, and (3) the plaintiff's due diligence to discover the facts. *Berkson v. Del Monte Corp.*, 743 F.2d 53, 55 (1st Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1765, 84 L.Ed.2d 826 (1985) (upholding finding on summary judgment of no fraudulent concealment); *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975); *see also In re Beef Industry Antitrust Litigation*, 600 F.2d 1148, 1169 (5th Cir.1979), *cert. denied,* 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980); *Charlotte Telecasters Inc. v. Jefferson-Pilot Corp.*, 546 F.2d 570, 574 (4th Cir.1976).

██ The burden rests squarely on the party pleading fraudulent concealment. *Akron Presform Mold Co. v. McNeil Corp.*, 496 F.2d 230, 233 (6th Cir.1974), *cert. denied,* 419 U.S. 997, 95 S.Ct. 310, 42 L.Ed.2d 270 (1974). In addition, any delay resulting from the plaintiff's ignorance of facts that would give rise to an action must be consistent with the requisite diligence. Facts that should arouse suspicion, for example, are equated with actual knowledge of the claim. *Dayco Corp., supra,* 523 F.2d at 394. Courts furthermore require particularity in pleading fraudulent concealment. *Rutledge v. Boston Woven House & Rubber Co.*, 576 F.2d 248, 250 (9th Cir.1978); *Dayco Corp., supra,* 523 F.2d at 394. The *Rutledge* court phrased the requirement of particularity as requiring the plaintiff to "allege facts showing affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief. Silence or passive conduct of the defendant is not deemed fraudulent, unless the relationship of the parties imposes a duty upon the defendant to make disclosure." 576 F.2d at 250.

██ Under the standard set forth above, plaintiffs plainly are not entitled to an equitable tolling of the limitations period on the ground of fraudulent concealment. Neither the complaint nor the proposed amended complaint contains specific allegations of acts by defendant to conceal the antitrust violation that forms the basis of plaintiffs' antitrust claim. General assertions by counsel that Pendleton supplied blatantly false and fraudulent information to retailers and sales representatives fall far short of meeting the pleading requirement for wrongful concealment. Because the fraudulent concealment standard equates suspicion with knowledge, plaintiffs need not have learned the intimate details of the resale price maintenance agreement for the statute of limitations to begin running. Plaintiffs' intoning that no one sales representative knew the scope of the alleged price maintenance plan neither indicates plaintiffs' ignorance of important facts underlying the present action nor establishes the exercise of due diligence in discovering them.

██ The Court finally notes a degree of tension in the pleadings between the argument for fraudulent concealment and the underlying antitrust cause of action. Plaintiffs contend on the one hand that Pendleton forced their sales representatives to do the dirty work involved in the alleged anticompetitive scheme or face reprisals, and that Pendleton terminated plaintiffs in part to make an example of them and in part because they knew of the 1979 FTC consent decree. On the other hand, plaintiffs argue for purposes of tolling the statute of limitations that they somehow remained oblivious to the import of Pendleton's actions. Although the Federal Rules of Civil Procedure permit plaintiffs to plead alternative theories of liabili-

ty, plaintiffs do not have the luxury of pleading in the alternative within the same cause of action. In short, plaintiffs have established no ground for equitably tolling the statute of limitations on their antitrust claim. As a consequence, plaintiffs must replead their antitrust count consistent with the applicable four-year statute of limitation.

### 2. Contract Claim

Although neither party has specifically addressed the issue, the Court will assume for purposes of defendant's motion that New York law applies to the breach of contract allegation that constitutes the plaintiffs' third cause of action. As noted earlier, plaintiffs seek recovery based on a duty of good faith implied in their employment contract. New York requires a plaintiff to bring an action based upon express or implied contractual obligations, except those covered by Article 2 of the Uniform Commercial Code, within six years. N.Y. Civ.Prac.Law § 213. Plaintiffs would have the Court toll the statute of limitations on their contract action by reason of Pendleton's alleged duress, acts of fraudulent concealment, and continuing course of conduct. As with their antitrust cause of action, however, plaintiffs' arguments in favor of equitably tolling the statute of limitations on their contract claim are unavailing.

### a. Duress

The New York courts recognize that duress may toll a statute of limitations when it is part of the cause of action alleged. *Pacchiana v. Pacchiana,* 94 A.D.2d 721, 462 N.Y.S.2d 256 (2d Dep't.1983). The duress that forms the cause of action is then considered a continuing wrong. Allegations of duress unrelated to the underlying cause of action, however, do not toll the statute of limitations. *Baratta v. Kozlowski,* 94 A.D.2d 454, 464 N.Y.S.2d 803, 806–07 (2d Dep't 1983) (citing *Piper v. Hoard,* 107 N.Y. 67, 71, 13 N.E. 632 (1887)); *Stadtman v. Cambere,* 73 A.D.2d 501, 422 N.Y.S.2d 102 (1st Dep't 1979) (threats of

physical violence do not toll limitations period). Since duress is not an element of plaintiffs' cause of action on the implied obligations in their employment contracts, the allegations of duress in the complaint cannot toll the six year statute of limitations for that claim.

### b. Fraudulent Concealment

■ Plaintiffs' contention that Pendleton's fraudulent concealment should toll the limitations period for the contract cause of action fails all three requirements for making out fraudulent concealment as they are discussed above in the context of the antitrust claim. First, plaintiffs do not allege that Pendleton attempted to conceal from them changes in their territories or commission rates. To the extent such alterations may have breached one or more terms of the employment agreements between plaintiffs and Pendleton, the breaches would have become apparent once Pendleton informed plaintiffs of the changes. Second, since Pendleton would have had to inform plaintiffs of the changes in order for them to become effective, plaintiffs cannot allege that they failed to discover the operative facts. Finally, plaintiffs make no affirmative allegations of due diligence.

### c. Continuing Violation

Plaintiffs baldly attempt to circumvent the contract statute of limitations by lumping together all the alleged affronts and styling Pendleton's course of conduct a continuing violation of the employment contracts at issue. The argument amounts to no more than an attempt to string together a series of discrete contract violations. In employment contracts, for statute of limitations purposes, a new cause of action arises with every violation and the statute of limitations runs separately as to each. *Airco Alloys Div., Airco Inc. v. Niagara Mohawk Power Corp.,* 76 A.D.2d 68, 430 N.Y. S.2d 179 (4th Dep't 1980). Plaintiffs, therefore, are barred from recovering for alleged breaches of their employment rela-

tion that occurred more than six years prior to the time plaintiffs filed this action.

### 3. Tort Claim

Plaintiffs' fourth cause of action, as originally pleaded, contained no allegations of specific incidents of defamation. Plaintiffs propose to allege in an amended pleading specific statements allegedly made during a meeting of Pendleton managers in Portland, Oregon on January 30, 1985 and other statements allegedly made by Pendleton managers during an October 1984 tour of the Northeast. Although defendant does not specifically address these issues, the Court notes that a one year statute of limitations applies to claims for defamation, N.Y.Civ.Prac.Law § 214, whereas a three year-period applies to claims sounding in *prima facie* tort, N.Y.Civ.Prac.Law § 215. Assuming plaintiffs amend their tort claim along the lines they have proposed, therefore, neither the limitations period for defamation nor that for *prima facie* tort would pose a bar to the claim as amended.

### II. Plaintiffs' Cross-Motion for Leave to Amend the Complaint

Plaintiffs seek to amend their complaint to include more specific allegations about the operation of the resale price maintenance scheme, the general outline of which they describe in the original complaint. Plaintiffs also seek to add allegations of specific instances when, they contend, various Pendleton employees made defamatory statements about them. Because defendant has answered plaintiffs' original complaint, plaintiffs can amend only with leave of court. Once a defendant has filed a responsive pleading, granting leave to amend the complaint under Rule 15(a), Fed. R.Civ.P., falls within the discretion of the trial court. *Zenith Radio Corp., supra,* 401 U.S. at 331, 91 S.Ct. at 802. Rule 15(a), however, directs that "leave shall be freely given when justice so requires," and amendments as a general matter are favored in order "to facilitate a proper decision on the merits." *Conley v. Gibson,* 355 U.S. 41, 48, 78 S.Ct. 99, 103, 2 L.Ed.2d 80

(1957). Reasons to deny a motion for leave to amend include undue delay, bad faith, and the resulting prejudice to the opposing party, or the futility of the amendment. *See Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Fustok v. Conticommodity Services, Inc.,* 103 F.R.D. 601, 603 (S.D.N.Y.1984).

In opposition to plaintiffs' motion, Pendleton contends first that plaintiffs unduly delayed in amending their complaint in that the information comprising the additional allegations now sought to be added was available to them at the time plaintiffs filed their original pleading. Even assuming that plaintiffs were aware of such information at the time they filed suit, however, their delay alone would not warrant the Court's denying leave to amend absent some showing of bad faith or prejudice. *State Teachers Retirement Bd. v. Fluor Corp.,* 654 F.2d 843, 856 (2d Cir.1981).

As a second ground for opposing plaintiffs' motion, Pendleton argues that it will be prejudiced by the proposed amendments in that the additional allegations will impose additional discovery burdens on them, at a point where plaintiffs have already taken thirteen depositions, and that the antitrust claim, as amended, will confuse the jury.

Until now, defendants have provided little or no discovery on the antitrust claims raised in the original complaint. Permitting plaintiffs to add more specific allegations concerning a claim already asserted in the initial complaint will not appreciably increase defendant's discovery burden. Nor will it prejudice defendant in any other way relevant to deciding plaintiff's cross-motion to amend. *Cf. Ralli v. Tavern on the Green,* 566 F.Supp. 329 (S.D.N.Y.1983) (counterclaim factually remote from central dispute, discovery completed and case ready for trial); *Chrysler Corp. v. Fedders Corp.,* 540 F.Supp. 706 (S.D.N.Y.1982)) (allowing counterclaim of malicious prosecution would require scrutiny of the merits in six other pending lawsuits). Indeed, the court in *Chrysler* indicated that denying leave to amend would be unwarranted if

the amendment merely restated a claim, if discovery had not proceeded far, if trial were not imminent, if a party sought merely to add new instances of prior violations, if the party otherwise would lose the claim, if the opposing party alleged only delay without prejudice, *or* if the new claim relied on no new facts. 540 F.Supp. at 715–16. Most if not all of these conditions are present in the instant case. Plaintiffs' proposed amended complaint fleshes out their original antitrust claim at a point in the litigation when discovery on the antitrust claim has barely begun and when no trial date has been set. In sum, Pendleton has alleged no prejudice that would warrant the Court's denying leave to amend.

Pendleton's final ground for objecting to plaintiffs' cross-motion is that the amendment plaintiffs propose would not cure the standing defect in plaintiffs' original antitrust claim. Because the Court holds above that plaintiffs adequately pleaded allegations supporting antitrust standing in the original complaint, the Court finds it unnecessary to consider Pendleton's further contention that the amendments would prove futile.

## CONCLUSION

For the foregoing reasons, defendant's motion for judgment on the pleadings is granted in part and denied in part. Plaintiffs' cross-motion for leave to amend the complaint is granted. Plaintiffs are directed to serve and file an amended complaint consistent with this opinion no later than April 1, 1986. The parties shall complete discovery by August 1, 1986 and shall file a pretrial order by August 29, 1986.

It is so ordered.