Robert J. GRIFFIN, et al., Plaintiffs,

v.

John A. McNIFF, et al., Defendants.

No. 88 Civ. 554(RJW).

United States District Court,
S.D. New York.

Aug. 17, 1990.

Beigel & Sandler, Ltd., P.C., New York City (Lewis S. Sandler, of counsel), for plaintiffs.

Solin & Breindel, P.C., New York City (Andrew Dash, of counsel), Green, Hoffman & Dankenbring, Clayton, Mo. (Martin M. Green, H. Todd Iverson, of counsel), for defendant Crown Energy, Inc.

Wilson, Elser, Moskowitz, Edelman & Dicker, New York City (James M. Kaplan, Pamela E. Kulsrud, of counsel), for defendant Wiener, Zuckerbrot, Weiss & Brecher.

D'Amato & Lynch, New York City (Robert E. Meshel, Gregg A. Willinger, of counsel), for defendant Ruffa & Hanover, P.C.

Debevoise & Plimpton, New York City (Mary Jo White, Edwin G. Schallert, Marian W. Payson, of counsel), Rodman W. Benedict, Associate Gen. Counsel, New York City, for defendant Price Waterhouse.

Parker Chapin Flattau & Klimpl, New York City (Alvin M. Stein, Mark I. Schlesinger, of counsel), for defendant J.H. Cohn & Co.

Stroock & Stroock & Lavan, New York City (Alvin K. Hellerstein, Elizabeth A.

Mullins, Alyssa Walden, of counsel), for defendant Grant Thornton.

WARD, District Judge.

Plaintiffs seek to recover for losses sustained as a result of their investment in certain oil and gas limited partnerships. Defendants Crown Energy, Inc. ("Crown"), Wiener, Zuckerbrot, Weiss & Brecher ("Wiener"), Ruffa & Hanover, P.C. ("Ruffa & Hanover"), Price Waterhouse, J.H. Cohn & Company ("J.H. Cohn"), and Grant Thornton ("Thornton") move to dismiss the First Amended Consolidated Complaint (the "Second Amended Complaint" or "S.A. C.")[1] pursuant to Rules 9(b), 12(b)(6), and/or 12(b)(1), Fed.R.Civ.P. For the reasons that follow, the motions of Price Waterhouse, J.H. Cohn and Thornton are granted, the motions of Crown and Wiener are granted in part and denied in part, and the motion of Ruffa & Hanover is denied.

## BACKGROUND

The general background of this action is recounted in this Court's March 13, 1989 Decision, familiarity with which is presumed.[2] Because the Second Amended Complaint differs in certain respects from the previous pleading considered by the Court, the basic facts currently alleged by plaintiffs are summarized below.

The Second Amended Complaint alleges that plaintiffs, who now consist of forty-five (45) investors, purchased interests in one or more of eleven (11) oil and gas limited partnerships (the "partnerships") as they were created in 1982 and 1983.[3] Plaintiffs contend that the partnerships were ostensibly formed to acquire, own and operate certain oil and gas producing properties located in Texas and Oklahoma, but actually were part of a scheme by defendants to defraud the limited partners of their investments.

Plaintiffs assert that they invested in the partnerships with the dual expectations of earning a profit from the operation of the oil and gas properties and deriving a tax benefit from the ownership of the partnership interests. S.A.C. ¶¶ 4, 76. These two goals were linked in more than just plaintiffs' expectations, as the partnerships needed to be able to earn a profit in order to generate tax deductions for the investors which would withstand scrutiny by the Internal Revenue Service.

In making their decisions to invest in the partnerships, plaintiffs maintain that they relied upon private placement memoranda ("PPMs"), prepared, issued, and distributed by certain defendants in connection with each partnership. According to plaintiffs, these PPMs contained material misrepresentations and omissions concerning the future profitability of the partnerships and the tax benefits available to the limited partners. S.A.C. ¶ 9. It is also alleged that the tax opinions, financial projections, geology reports, and production evaluations regarding the oil and gas reserves contained in the drilling properties, all attached as exhibits to the PPMs, were materially misleading.

The crux of the Second Amended Complaint is that defendants knew it was not reasonable to expect the partnerships to be commercially profitable in producing oil or to generate legitimate tax deductions, given the properties on which they were drilling, the manner in which they were organized, and the expenses they were to incur. Plaintiffs maintain the partnerships were in fact not profitable, and that the Internal Revenue Service concluded that each of the

---

1. The Second Amended Complaint represents plaintiffs' third pleading in this case.

2. That decision, *Griffin v. McNiff* (hereinafter *"Griffin I"*), is reported at [Current Binder] Fed. Sec.L.Rep. (CCH) ¶ 94,389, 1989 WL 80451 (March 13, 1989).

3. The Second Amended Complaint alleges that twelve partnerships were formed by defendants, six in 1982, S.A.C. ¶¶ 24–27 and six in 1983,

S.A.C. ¶ 284. Only eleven partnerships, however, are identified as having been invested in by plaintiffs. Ex. A annexed to S.A.C. Of these eleven identified partnerships, five were formed in 1982: Harrow Energy Ltd.; Carylton Energy Ltd.; Hastings Energy Ltd.; Runnymede Energy Ltd.; and Litchfield Energy Ltd. The remaining six partnerships were formed in 1983: Devon Energy Ltd.; Fairfield Energy Ltd.; Groton Energy Ltd.; Harwinton Energy Ltd.; Brookfield Energy Ltd.; and Canterbury Drilling Ltd.

partnerships was formed without an actual objective of making a profit and disallowed the tax deductions taken by plaintiffs. S.A.C. ¶¶ 5–8. As a result of the fraudulent scheme, plaintiffs allege that they have lost their initial investment and been subjected to penalties and interest on the disallowed tax deductions. S.A.C. ¶ 9.

The fifteen defendants involved in this lawsuit include seven entities and individuals allegedly involved with creating and managing the partnerships. These defendants, none of whom are involved in the instant motions to dismiss the Second Amended Complaint, include Wycombe Energy Group, Inc. ("Wycombe"), the corporate general partner for each of the partnerships, as well as John A. McNiff II ("McNiff"), Caryl Wilkie, John A. McNiff III, Kristen M. McNiff and Mallory Moore, all reportedly insiders and/or directors of Wycombe (collectively the "McNiff Defendants").

The various entities involved in operating or leasing the oil and gas prospects are also named as defendants. They include (1) Phoenix Oil & Gas, Inc. ("Phoenix"), the successor to Gillham Petroleum, Inc. ("Gillham"), the driller-operator for the 1982 limited partnerships, (2) Crown, the sublessor of the drilling prospects for the 1982 partnerships, and (3) William Kester ("Kester"), the director of Star Dust Mines, Inc., the parent corporation of Trans–Tennessee Energy, Inc. which was the driller-operator for the 1983 Devon Energy, Fairfield Energy, Groton Energy and Harwinton Energy Limited Partnerships.

In addition, plaintiffs named as defendants three law firms, Wiener, Ruffa & Hanover, and Martin & Deacon, which allegedly prepared the PPMs and rendered other services to certain of the limited partnerships at various points in time. The final defendants are three accounting firms, Price Waterhouse, J.H. Cohn, and Thornton [4], which were involved in reviewing the financial projections and/or approving the tax opinions prepared by the law firm defendants.

Previously, a number of defendants moved to dismiss the First Amended Complaint. On March 13, 1989, this Court granted the motions of Crown, Wiener, Martin & Deacon, Price Waterhouse, J.H. Cohn, and Thornton, dismissing the First Amended Complaint against them for failure to plead fraud with the requisite particularity demanded by Rule 9(b).[5] The Court found that plaintiffs failed adequately to differentiate among the various defendants, to specify what fraudulent acts each defendant was charged with having committed, and to allege facts which could support an inference of scienter. In accordance with the general practice regarding Rule 9(b) motions, plaintiffs were afforded leave to replead the dismissed fraud claims.

The motions of the McNiff Defendants to dismiss the fraud claims against them were denied.[6] The Court found that the First Amended Complaint was "rife with the type of generalized, conclusory allegations that Rule 9(b) was designed to discourage," but nonetheless held that the allegations were sufficiently detailed to withstand motions to dismiss by the McNiff Defendants, as they could all be fairly characterized as insiders participating in the offer of the securities in question. *Griffin I,* ¶ 94,389 at 92,531.

Plaintiffs filed their Second Amended Complaint on May 19, 1989. The Second Amended Complaint, consisting of one hundred fifty-one (151) pages and five hundred eighteen (518) numbered paragraphs, as well as over a thousand pages of exhibits, sets forth thirty-seven claims. These claims allege that various defendants are

---

**4.** Thornton, a partnership of certified public accountants, is the successor to the accounting firm of Fox & Company ("Fox") which rendered certain accounting services to the 1982 partnerships.

**5.** In that decision, the Court also dismissed plaintiffs' claims under section 17(a) of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C.

77q(a), holding that no private right of action exists under that statutory provision, as well as the pendent state law claims for negligence against the law and accounting firms.

**6.** Caryl Wilkie did not participate in these motions.

liable for (1) primary violations of section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission, 17 C.F.R. § 240.10b–5; (2) secondary violations of section 10(b) and Rule 10b–5, by acting as aiders and abettors; (3) common law fraud; (4) negligence; and/or (5) violations of the Racketeer Influenced and Corrupt Organizations Act ("R.I.C.O."), 18 U.S.C. §§ 1962(a), (c) and (d).

The moving defendants once again argue that plaintiffs have failed to plead fraud with the particularity required by Rule 9(b). They also maintain that the claims in the Second Amended Complaint must be dismissed pursuant to Rules 12(b)(6) and 12(b)(1), Fed.R.Civ.P.

## DISCUSSION

A. *Rule 9(b)—Pleading Fraud With Particularity*

■ Rule 9(b) provides that:

In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind may be averred generally.[7]

As the Court explained in *Griffin I*, in a motion to dismiss a complaint for failure to plead fraud with particularity as required by Rule 9(b), plaintiffs' allegations must be taken as true. *E.g., Luce v. Edelstein*, 802 F.2d 49, 52 (2d Cir.1986). The Court must read the complaint generously, and draw all inferences in favor of plaintiffs. *Cosmas v. Hassett*, 886 F.2d 8, 11 (2d Cir.1989). Furthermore, Rule 9(b) must be read in conjunction with Rule 8(a), Fed.R.Civ.P., which requires plaintiffs to plead only a short, plain statement of the grounds upon which they are entitled to relief. *Ross v. A.H. Robins Co.*, 607 F.2d 545, 557 n. 20 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). The serious nature of a charge of fraud, however, renders mere conclusory allegations that defendants acted fraudulently insufficient to satisfy Rule 9(b). *Segal v. Gordon*, 467 F.2d 602, 607 (2d Cir.1972); *Center Savings & Loan Assoc. v. Prudential–Bache Securities, Inc.*, 679 F.Supp. 274, 276 (S.D.N.Y.1987).

■ Rule 9(b) is designed to provide a defendant with fair notice of a plaintiff's claim in order to enable the defendant to prepare a defense, to protect his or her reputation or goodwill from harm flowing from baseless allegations of fraud, and to reduce the number of strike suits. *Cosmas v. Hassett, supra*, 886 F.2d at 11; *DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987).

■ In order to satisfy Rule 9(b) "a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Cosmas v. Hassett, supra*, 886 F.2d at 11. *See also Griffin I*, ¶ 94,389 at 92,531 (citing *Conan Properties, Inc. v. Mattel, Inc.*, 619 F.Supp. 1167, 1172 (S.D.N.Y.1985)). Where there are multiple defendants, the complaint must disclose the specific nature of each defendant's participation in the alleged fraud. *DiVittorio v. Equidyne Extractive Industries, Inc., supra*, 822 F.2d at 1247. In an action alleging securities fraud, "reference to an offering memorandum satisfies 9(b)'s requirement of identifying time, place, speaker and content of

---

7. It is well settled that a claim of securities fraud under section 10(b) falls within the ambit of Rule 9(b). *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir.1986); *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 115 (2d Cir.1982); *Ross v. A.H. Robins, Co.*, 607 F.2d 545, 557 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980). Rule 9(b) also extends both to plaintiffs' R.I.C.O. claim based wholly upon alleged predicate acts of securities fraud under section 10(b), mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343, *see Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 49–50 (2d Cir.1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988) *overruled on other grounds, United States v. Indelicato (en banc)*, 865 F.2d 1370 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 56, 107 L.Ed.2d 24 (1989), and to their claim alleging common law fraud. *E.g., Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572, 576 (2d Cir.1969).

representations where ... defendants are insiders or affiliates participating in the offering of securities." *Ouaknine v. MacFarlane,* 897 F.2d 75, 80 (2d Cir.1990); *Luce v. Edelstein, supra,* 802 F.2d at 55.

■ While Rule 9(b) allows "condition of mind" to be averred generally, plaintiffs must at least present those circumstances that provide a minimal factual basis for the allegations of scienter. *E.g., Connecticut National Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987). In other words, plaintiffs must " 'specifically plead those events' which 'give rise to a strong inference' that defendants had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Id.* at 962 (citing *Ross v. A.H. Robbins, supra,* 607 F.2d at 558); *Wexner v. First Manhattan Co.,* 902 F.2d 169, 172 (2d Cir.1990) ("Although scienter need not be alleged with great specificity, plaintiffs are still required to plead the factual basis which gives rise to a 'strong inference' of fraudulent intent").

### 1. *Crown*

Plaintiffs assert claims against Crown for (1) securities fraud under section 10(b) and Rule 10b–5, (2) aiding and abetting securities fraud, (3) common law fraud, and (4) RICO, predicated on fraud.

■ In *Griffin I,* the Court found that the First Amended Complaint failed to allege adequately Crown's participation in the fraud. The allegations of fraud which plaintiffs claimed involved Crown were either framed generally against a group of defendants, or specifically against defendants other than Crown. For example, plaintiffs alleged that certain reports, projections and evaluations were false and misleading, but failed to identify how Crown was connected to these items. *See Griffin I,* ¶ 94,389 at 92,532–33. Such generalized pleading was clearly insufficient under Rule 9(b).

The Second Amended Complaint responded to the deficiencies noted by the Court in *Griffin I* by adding needed particularity to the allegations concerning Crown. Crown is alleged to have been the sublessor of the drilling prospects for the 1982 partnerships, S.A.C. ¶¶ 26, 121. These drilling rights had been acquired by Crown from Gillham. S.A.C. ¶¶ 28–29, 121. The subleases to the partnerships provided that Crown would receive sixty percent (60%) of all revenues generated by the partnerships' oil and gas production, of which it would retain fourteen percent (14%). S.A.C. ¶¶ 30, 32.

The partnerships also agreed to pay Crown certain Minimum Annual Royalties ("MARs") as an advance against production royalties. S.A.C. ¶¶ 33–38. Apparently, a minimum annual royalty payment could be tax deductible if it met certain requirements. The MARs paid to Crown, however, were found not to meet these requirements by the Internal Revenue Service, and were not deductible. S.A.C. ¶¶ 7, 129–131. Plaintiffs contend that the explicit structure of the MARs by definition precluded them from satisfying the criteria necessary for favorable tax treatment under the prevailing tax regulations. *Id.*

Crown participated in the preparation of the financial projections contained in the PPMs. S.A.C. ¶ 50. Plaintiffs contend that the projections overstated the size and profitability of the partnerships' oil reserves, and created the false impression that it was reasonable to assume that the partnerships would locate and produce commercial quantities of oil. ¶¶ 51, 55, 126.[8]

■ Despite the added particularity in the Second Amended Complaint regarding it, Crown argues that plaintiffs have failed adequately to plead scienter. Plaintiffs, however, can plead scienter by alleging facts "showing a motive for committing fraud and a clear opportunity for doing

---

8. The assumptions upon which the projections were based, including those assumptions regarding the production of commercial quantities of oil, the extent of salt water disposal expenses, and the future prices for oil, are alleged to have been unreasonable and to have helped create the false and misleading impression that the partnerships could be profitable. ¶¶ 50–55, 127.

so." *Beck v. Manufacturers Hanover, supra*, 820 F.2d at 50. Indeed, the lenient standard for pleading scienter will be satisfied even if plaintiffs do not allege facts which demonstrate that defendants had a motive for committing fraud, so long as plaintiffs adequately identify circumstances indicating conscious behavior by defendants. *Cosmas v. Hassett, supra*, 886 F.2d at 13.

 Here, plaintiffs have alleged that Crown had a significant financial interest in the partnerships and ready access to the actual condition of the drilling properties as the sublessor of the drilling prospects. These allegations, combined with the allegations that Crown participated in the preparation of the misleading financial projections which were distributed to the investors as attachments to the PPMs, are sufficient to satisfy the threshold requirements for pleading scienter under Rule 9(b). *See Cosmas v. Hassett, supra*, 886 F.2d at 13. Accordingly, that aspect of Crown's motion seeking to dismiss the Second Amended Complaint against it under Rule 9(b) is denied.

### 2. The Law Firms—Wiener and Ruffa & Hanover

Plaintiffs assert claims against Wiener and Ruffa & Hanover for (1) securities fraud under section 10(b) and Rule 10b–5, (2) aiding and abetting securities fraud, (3) common law fraud and (4) RICO, predicated on fraud.

#### a. Wiener

The Second Amended Complaint alleges that Wiener, legal counsel to the 1982 partnerships, as well as Wycombe and Crown, prepared the PPMs and tax opinions for the 1982 partnerships. S.A.C. ¶¶ 165, 168–169. Plaintiffs contend that material misrepresentations were made in both the PPMs and the tax opinions, and that Wiener knew these representations were false at the time the documents were distributed to the investors. It is also alleged that Wiener had a direct financial interest in the production of the partnership operations, as it was to receive two percent (2%) of the

production royalties paid to Crown by each partnership. S.A.C. ¶ 32.

In a document entitled "Special Report to Limited Partners", dated February 24, 1983, (the "Special Report") the 1982 limited partners were informed by Wycombe that Price Waterhouse was withdrawing its report on the financial projections and its tax opinion letters as a result of an independent investigation which uncovered that the estimated oil reserves for the partnerships might be only a small fraction of what was stated in the offering memorandum and because of questions which had come to light regarding the authorship of the original geologist's reports. Exhibit I annexed to Second Amended Complaint. As a result of Price Waterhouse's withdrawal, Wiener withdrew its tax opinions, noting that these opinions had been predicated, in part, on both Price Waterhouse's projections and the geologist's reports.

In considering the First Amended Complaint, the Court found that plaintiffs had failed to allege sufficient facts to support finding an inference that Wiener knew of the alleged falsity of the representations in the PPMs or the tax opinions. Indeed, while plaintiffs argued that Wiener's scienter could be inferred from its financial interest in the partnerships, they had not even alleged this in the First Amended Complaint, which the Court concluded was an indication of plaintiffs' "inadequate treatment of their responsibilities under Rule 9(b)." *Griffin I*, ¶ 94,389 at 92,534.

In the mass of allegations contained in the Second Amended Complaint, Wiener's role in the fraud is only marginally expanded upon from the allegations of the prior pleading. Furthermore, the manner in which many of these allegations are presented, using cross-references to various paragraphs and exhibits which frequently concern other defendants, often works to create a muddled picture of Wiener's alleged role in the fraud.

 Nevertheless, while acknowledging that this question presents a close call and that a charge of fraud against a law firm should not lightly be inferred, *see Securi-*

*ties and Exchange Commission v. Frank,* 388 F.2d 486, 489 (2d Cir.1968), the Court concludes that the Second Amended Complaint meets the threshold requirements for pleading fraud against Wiener. In addition to linking specific misrepresentations and omissions in the PPMs and the tax opinions to Wiener, plaintiffs have specified Wiener's involvement as counsel to the various entities involved in subleasing the partnership properties and identified Wiener's financial interests in the operation of the partnerships. These circumstances support inferring that the facts concerning the limited supplies of commercially obtainable oil in these properties may have been known to Wiener, and that Wiener may have known of the alleged fraudulent scheme. Accordingly, that aspect of Wiener's motion seeking dismissal of the fraud claims under Rule 9(b) is denied.

b. Ruffa & Hanover

Ruffa and Hanover is alleged to have been the law firm involved in preparing the PPMs and tax opinions contained in four 1983 partnerships: Devon Energy, Ltd.; Fairfield Energy, Ltd.; Groton Energy, Ltd.; and Harwinton Energy, Ltd. (collectively the "Panhandle partnerships"). Plaintiffs maintain that the PPMs and tax opinions contained misrepresentations and omissions concerning the extent of the oil reserves in the properties, the potential profitability of the partnerships, and the legitimacy of investor tax deductions, akin to those alleged in the 1982 partnerships.

In addition, plaintiffs assert that a scheme existed among Kester, McNiff and William Ruffa ("Ruffa"), the senior partner of Ruffa & Hanover, to defraud the investors of their partnership interests. S.A.C. ¶ 322. Pursuant to this scheme, plaintiffs allege that Star Dust was to reacquire the partnerships' working interests in the oil prospects with the wells on those prospects already drilled and operating, or equipped to operate, at the partnerships' expense. Defendants were to achieve this goal by having Kester, who would oversee the drill-

ing, stop the drilling a number of feet above the oil bearing strata. S.A.C. ¶ 326–27. The result of this method of drilling would be to "Rubenize" the wells, resulting in the pumping of evaporated crude oil and natural gas above the oil bearing strata out of the wells, leaving behind the oil in the fields. S.A.C. ¶ 328.

Plaintiffs maintain that Kester was to reduce the flow of gas by closing the valves of the well heads and then notify the investors that the partnerships' wells were no longer commercially viable and were being closed down. S.A.C. ¶¶ 329–330. After a lack òf production from the partnerships' wells for a twelve month period, the original lessor would have the right to initiate reversion proceedings under provisions in Star Dust's lease. S.A.C. ¶ 331. Once the property had reverted to the original lessor, Star Dust was to reacquire the leases, complete with the wells drilled and equipment in place, and with oil remaining only a few feet from the end of the Rubenized well holes. S.A.C. ¶ 332. Ruffa and McNiff were then to exercise an option they held to acquire 66.66% of the stock of Star Dust. S.A.C. ¶¶ 323, 333. Only Kester's removal from his position with Star Dust prevented the completion of this fraudulent scheme. S.A.C. ¶¶ 335, 351–52.[9]

These allegations are sufficient to give rise to a strong inference of scienter on the part of Ruffa & Hanover and satisfy the requirement of Rule 9(b). The option Ruffa held in Star Dust, as well as the alleged scheme to appropriate the drilling leases after the partnerships had paid for the drilling costs and equipment, allege a sufficient motive for Ruffa to conceal his knowledge of the fraud. Inasmuch as Ruffa was a senior partner of Ruffa & Hanover, that knowledge may be imputed to the law firm. *See Shumate v. McNiff,* 1990 WL 6549, 1990 U.S. Dist LEXIS 547 (S.D.N.Y. January 22, 1990) (court rejected 9(b) challenge by Ruffa & Hanover to similar fraud claims based on other oil and gas limited partnerships formed by McNiff). Indeed, the reasoning applied by the court in *Shu-*

---

**9.** The allegations regarding Ruffa & Hanover, and the Panhandle partnerships in general, are considerably more detailed than those involving the 1982 partnerships.

*mate* in holding that the plaintiffs had sufficiently alleged a securities fraud violation against Ruffa & Hanover is equally applicable to this case.

> Plaintiffs allege that the misrepresentations in the PPMs, prepared by defendants, caused their economic harm in that plaintiffs would not have invested in the [limited partnerships] had Ruffa's true involvement in the [limited partnerships] been revealed, along with other omissions and misrepresentations. In addition, plaintiffs properly allege that they were assured of the reliability of the PPMs due to [Ruffa & Hanover's] preparation and their reputation in the legal and investment community. Plaintiffs having sufficiently alleged a securities fraud violation, the motion ... to dismiss the securities fraud claim is denied.

*Id.* at 7. Accordingly, that aspect of Ruffa & Hanover's motion to dismiss the fraud claims under Rule 9(b) is denied.[10]

### 3. The Accounting Firms—Price Waterhouse, J.H. Cohn and Thornton

 As the Court explained in *Griffin I*, Rule 9(b) is especially designed to protect the reputation of accountants and other professionals from injury caused by unsubstantiated charges of fraud. *See In re Union Carbide Corp. Consumer Products Business Sec. Litigation*, 666 F.Supp. 547, 557 (S.D.N.Y.1987).

#### a. Price Waterhouse

Plaintiffs assert claims against Price Waterhouse for (1) securities fraud under section 10(b) and Rule 10b–5, (2) aiding and abetting securities fraud, (3) common law fraud, (4) RICO, predicated on fraud, and (5) negligence.

Price Waterhouse is alleged to have participated in the fraud concerning the 1982 partnerships by reviewing management's

financial projections and by reviewing and approving tax opinions prepared by Wiener. S.A.C. ¶¶ 50, 58, 189. The reports prepared by Price Waterhouse as a consequence of its review are alleged to contain misrepresentations and omissions concerning the profit potential of the partnerships. In addition, the reports as to the financial projections are alleged to have falsely indicated that they contained all significant disclosures necessary for understanding management's projections. S.A.C. ¶ 73. The tax opinion letters, which indicate that Price Waterhouse had reviewed Wiener's tax opinions and agreed with their substance and that Price Waterhouse's policy was to prepare the tax returns for the partnerships on the basis of the tax opinions, are alleged to be fraudulent because they failed to indicate that the tax deductions would not be realized.

In *Griffin I*, the Court concluded that plaintiffs had failed to plead adequately the scienter element of the fraud charges against Price Waterhouse. Plaintiffs had argued that a strong inference of scienter could be found because Price Waterhouse had withdrawn its reports and tax opinion letters, but the Court concluded that plaintiffs had failed to set forth any facts to indicate that, prior to the closing of the offerings, Price Waterhouse knew of, or recklessly disregarded, the information which caused it to withdraw its reports. *Griffin I*, ¶ 94,389 at 92,535.

 Once again Price Waterhouse argues that the claims against it must be dismissed under Rule 9(b) because plaintiffs have failed to plead facts which give rise to a strong inference of scienter, while plaintiffs, in essence, ask the Court to find a strong inference of scienter from the circumstances alleged surrounding Price Waterhouse's withdrawal of its reports and tax opinion letters.[11]

---

**10.** Likewise, Ruffa & Hanover's argument that the securities fraud claims fail to state a claim for relief are also unavailing. *See Shumate v. McNiff, supra*, 1990 WL 6549, 1990 U.S.Dist. LEXIS 547 at 7.

**11.** Plaintiffs also allege that Price Waterhouse had been the accountant for two MAR partner-

ships in which defendants Crown and Gillham, but not Wycombe, were involved. They present no facts regarding these partnerships, however, which might indicate that these dealings put Price Waterhouse on notice of the alleged fraud complained of in this action. *See Dannenberg v. Dorison*, 603 F.Supp. 1238, 1241 (S.D.N.Y.

On February 2, 1982 Price Waterhouse advised the general partner of each of the partnerships by letter that it was withdrawing its reports on the financial projections and its tax opinion letters. Exhibit N annexed to S.A.C. In the February 2, 1983 letter, Price Waterhouse explained that it had hired an independent petroleum consulting firm to review the projected reserves in the partnership properties, and that the firm estimated that the reserves were likely to be only a small fraction of the reserves set forth in the PPMs. *Id.* As a result of this review, and due to questions concerning the authorship of the original geologist's reports for certain of the partnerships, Price Waterhouse stated that there were substantial questions regarding the overall economics of the programs and that significant tax deductions would not likely be allowed. *Id.* Thus, the letter informed the general partners that Price Waterhouse had decided to withdraw it reports and would not prepare the tax returns for the partnerships. *Id.* Price Waterhouse requested that management notify the investors of its withdrawal, and the reasons behind its withdrawal. *Id.* The letter also stated that Price Waterhouse believed it was obligated to inform the limited partners itself, should management refuse to do so. *Id.*

On February 24, 1983, Wycombe issued the Special Report to the limited partners notifying them of Price Waterhouse's withdrawal and the consequent withdrawal of Wiener's tax opinions. Exhibit I annexed to S.A.C. The Special Report quoted verbatim the portion of Price Waterhouse's letters announcing the withdrawal and ex-

plaining the reasons behind it, and also expressed management's criticism and disagreement with Price Waterhouse's position.

In the Special Report, Wycombe stated that, in December of 1982, it had heard from unidentified third parties that Price Waterhouse had made a decision not to participate further in MAR programs. Plaintiffs allege that Price Waterhouse decided to withdraw from 21 MAR programs, of which six involved Wycombe, because it determined that the MAR programs, as structured, did not satisfy the IRS requirements or because it determined that the projections for these programs were unreasonable. S.A.C. ¶ 200. They principally argue that this allegation, coupled with Wycombe's statement, provide the factual predicate for inferring that Price Waterhouse knew of the deficiencies in the oil reserves and/or overall partnership structure at or about the time of the close of the final 1982 partnership, Hastings Energy, Ltd.[12]

The Court disagrees, as this factually unsupported allegation cannot sustain a strong inference of scienter. Plaintiffs, rather than providing facts to buttress their allegations of scienter, allege facts which substantially undercut the strength of any inference of scienter that might be drawn from Price Waterhouse's conduct.

Plaintiffs allege that Price Waterhouse did not hire the engineering firm which reviewed the partnership reserves until January 1983. S.A.C. ¶ 203. On January 20, 1983, Price Waterhouse and representatives of the engineering firm met with Wy-

---

1985) (alleging that defendant participated in numerous transactions branded as fraudulent, without pleading facts that would permit an inference of knowledge that any of these transactions was fraudulent, is insufficient to state a claim for fraud); *Ross v. Warner,* 480 F.Supp. 268, 272 (S.D.N.Y.1979).

Similarly, simply alleging that Price Waterhouse, due to its position as the accounting firm reviewing the projections, must have known or recklessly disregarded the true facts, is insufficient to support a strong inference of scienter under Rule 9(b) absent additional factual assertions to bolster such a claim. *See Blanchard v. Katz,* 705 F.Supp. 1011, 1012–13 (S.D.N.Y.1989);

*The Limited, Inc. v. McCrory Corp.,* 683 F.Supp. 387, 394 (S.D.N.Y.1988); *Weinberger v. Kendrick,* 451 F.Supp. 79, 83 (S.D.N.Y.1978).

12. The Court notes that, in the First Amended Complaint, plaintiffs alleged that Price Waterhouse had decided to withdraw "[i]mmediately following the closing of the 1982 offerings." F.A.C. ¶ 32. In the present pleading, plaintiffs allege that the decision to withdraw occurred "at or about the time that the Hastings partnership closed." S.A.C. ¶ 201. It is axiomatic that plaintiffs cannot satisfy the requirements of Rule 9(b) by making their allegations more vague, rather than more specific.

combe, Wiener, Gillham and Crown to discuss the engineering firm's determinations and Price Waterhouse's concern with the structure of the partnerships. S.A.C. ¶¶ 88, 203. Price Waterhouse explicitly premised its withdrawal upon the engineering firm's findings that the oil reserves were significantly overstated in the PPMs. Exhibit N annexed to S.A.C. These findings indicated that the partnerships might not be economically viable, and therefore, that the tax deductions might not be sustained—the same allegations which form the gravamen of plaintiffs' fraud claims. Moreover, these findings necessarily occurred after Price Waterhouse had prepared its reports and tax opinion letters, and after the offerings for the various partnerships had closed.

There is no factual support to infer that other aspects of the alleged fraud were known to Price Waterhouse prior to the close of the partnership offerings. While plaintiffs rely on Wycombe's statement in the Special Report of what it had heard to argue that Price Waterhouse had decided to withdraw from the partnerships in December of 1982, Wycombe, also in the Special Report, stated that Price Waterhouse based its decision to withdraw from all 21 partnerships because of a concern over the possible reserves to be produced which arose as a result of evaluations performed by the engineering firm it had hired. Exhibit I annexed to S.A.C. While plaintiffs ignore this latter statement in the Special Report, they offer no other factual allegations to connect Price Waterhouse with knowledge of any misrepresentations or omissions concerning the 1982 partnerships prior to the engineering firm's review of the partnerships' oil reserves.

Thus, at best, the Second Amended Complaint alleges that Price Waterhouse became aware of these deficiencies in January of 1983. Subsequently, Price Waterhouse acted to inform the general partners of its concern, withdraw its reports and tax opinion letters, and ensure that the investors were notified of the reasons behind its withdrawal. These allegations simply do not support a strong inference of scienter. If anything, they indicate exactly the oppo-

site: that Price Waterhouse did not know of the alleged wrongdoing during the offerings of the partnerships.

While the Court recognizes the difficulties inherent in pleading a defendant's actual state of mind, factual allegations to support a strong inference of scienter must be supplied to satisfy Rule 9(b) in light of the serious harm that baseless accusations of fraud can cause to the reputation of a professional firm. Plaintiffs have failed to muster the bare minimum of facts necessary to support finding an inference that Price Waterhouse had the requisite scienter. Accordingly, the fraud claims against Price Waterhouse must be dismissed.

#### b. J.H. Cohn

Plaintiffs assert claims against J.H. Cohn for (1) securities fraud, (2) aiding and abetting securities fraud, (3) common law fraud, and (4) RICO, predicated on fraud.

It is alleged that J.H. Cohn prepared the financial projections for the Panhandle partnerships which were formed by Wycombe in the last half of 1983. S.A.C. ¶¶ 284–85, 378. These projections, included in the PPMs, were prepared by J.H. Cohn based upon information supplied by representatives of the partnerships. S.A.C. ¶ 310. The projections are alleged to have been based upon unreasonable assumptions regarding the potential profitability of the partnerships. J.H. Cohn is not alleged to have had any role in preparing the PPMs or the tax opinions for the Panhandle partnerships.

The allegations pertinent to J.H. Cohn have not substantially changed in the Second Amended Complaint from those considered and found to be lacking by the Court in *Griffin I.* At that time, the Court concluded that plaintiffs had provided

no factual allegations to support an inference that J.H. Cohn contemporaneously knew that the information it used to prepare the financial projections was false or that the projections themselves were misleading. Plaintiffs assert that [J.H. Cohn's] failure to disclose the withdrawal of Wiener and Price Waterhouse

provides a strong inference of scienter. They also argue that J.H. Cohn must have known of the fraud because it would have inquired about it before preparing the projections. Neither of these arguments is factually supported by any allegation in the Complaint.

*Griffin I,* ¶ 94,389 at 92,535.

■ To a large extent, J.H. Cohn and plaintiffs repeat the same arguments previously considered by the Court. Plaintiffs argue that a strong inference of scienter can be found because J.H. Cohn must have inquired of the prior activities of Wycombe, uncovered the previous partnerships, the withdrawal of the reports and tax opinion letters by Price Waterhouse and the tax opinions by Wiener, and the reasons given for these withdrawals. S.A.C. ¶¶ 379–80. The information about the 1982 partnerships, plaintiffs contend, put J.H. Cohn on notice that a further inquiry was necessary before it relied on the information and assumptions supplied by Wycombe in preparing the projections. S.A.C. ¶ 381. In addition, plaintiffs argue that as an accounting firm, familiar with the tax laws, J.H. Cohn had no reasonable basis for concluding that the MARs as structured would yield sustainable tax deductions. S.A.C. ¶ 383. These arguments, presented without any further factual basis, are insufficient to raise the necessary inference of scienter.

■ Plaintiffs' contentions regarding J.H. Cohn boil down to the assertion that J.H. Cohn had a duty to investigate the activities of the prior unrelated partnerships. In and of itself, however, a failure to investigate does not rise above the level

of negligence unless there are factual allegations which tend to establish knowledge of the alleged fraudulent acts. *See Eickhorst v. American Completion and Development Corp.,* 706 F.Supp. 1087, 1093–94 (S.D.N.Y.1989); *O'Brien v. Price Waterhouse,* 740 F.Supp. 276 (S.D.N.Y.1990); *The Limited, Inc. v. McCrory Corp., supra,* 683 F.Supp. at 394. No such factual allegations have been provided by plaintiffs.[13]

■ On their face, the Panhandle partnerships had no connection with the prior 1982 partnerships. Indeed, plaintiffs' allegations do not demonstrate that J.H. Cohn had any duty to undertake an investigation designed to uncover the history of prior, unrelated partnerships, given the limited function it was retained to perform for the Panhandle partnerships. Accordingly, that aspect of J.H. Cohn's motion seeking to dismiss the fraud claims against it under Rule 9(b) is granted.

B. *Thornton—Failure to State A Claim for Securities Fraud*[14]

Plaintiffs assert claims against Thornton for (1) aiding and abetting securities fraud, (2) common law fraud, (3) RICO, predicated on fraud, and (4) negligence.

Following the withdrawal of Price Waterhouse and Wiener, Thornton is alleged to have met with Wycombe and been apprised of all the relevant events that occurred after the closing of the partnerships, including the reasons for the withdrawals. S.A.C. ¶ 251. Despite being informed of these developments, Thornton is

---

**13.** Their conclusory assertion regarding J.H. Cohn's expertise with the tax laws is much too general to support an inference that J.H. Cohn had the requisite scienter to support a claim of fraud, *see Eickhorst v. American Completion and Development Corp., supra,* 706 F.Supp. at 1094 n. 10, not to mention that J.H. Cohn is only alleged to have been involved with preparing the financial projections, and is not alleged to have opined regarding the tax aspects of the partnerships.

**14.** Thornton principally argues that plaintiffs have failed to state a claim for securities fraud, but also asserts that the Second Amended Complaint fails to satisfy Rule 9(b) because there are no facts alleged to support an inference of scien-

ter on its part. The Court cannot agree, however, as plaintiffs allege that Thornton was apprised of the circumstances surrounding the withdrawals prior to becoming involved with the partnerships. Therefore, they maintain that Thornton substantially knew of the facts which would render the tax opinion incorrect, or was at least on inquiry notice that, before approving the tax opinions and preparing the partnership tax returns, it needed to further investigate the discrepancies which had been identified by Price Waterhouse. Plaintiffs argue that any such investigation would have uncovered the alleged fraud. These allegations are sufficient to support finding scienter.

alleged to have approved Wiener's withdrawn tax opinions and agreed to prepare the K–1 tax forms for the partnerships. *Id.* The K–1's prepared by Thornton claimed deductions based on the MARs and the intangible drilling costs which plaintiffs allegedly relied upon in preparing their own individual tax returns, only to have these deductions disallowed by the Internal Revenue Service. *Id.*

Plaintiffs' aiding and abetting a securities fraud claim does not satisfy the requirements of Rule 12(b)(6), despite the allegation that Thornton knew of the misrepresentations concerning the oil reserves as a consequence of the withdrawals of Price Waterhouse and Wiener, because plaintiffs have not alleged any misrepresentations or omissions on the part of Thornton which could support such a claim.

▮▮▮▮▮▮ To maintain a claim for aider and abettor liability under section 10(b), plaintiffs must plead: (1) a primary securities violation; (2) knowledge of that violation; and (3) substantial assistance by the defendant in furtherance of the primary violation.[15] *See Decker v. Massey–Ferguson, Ltd.,* 681 F.2d 111, 119 (2d Cir.1982); *IIT, International Investment Trust v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980). While plaintiffs have adequately pleaded the existence of a primary violation by certain defendants, their allegations concerning Thornton's role in the alleged fraud cannot support an inference that Thornton substantially assisted the furtherance of any primary violation.

Plaintiffs allege that Thornton became involved with the partnerships only after Price Waterhouse and Wiener had withdrawn. S.A.C. ¶ 251. In the Special Report, Wycombe notified the limited partners that Thornton had been retained to prepare the partnership tax returns and that Thornton had approved Wiener's tax opinion. The Special Report, however, was issued after the close of the partnerships, and after the final installment payment was made on the purchase of the partnership interests. At no time prior to the

Special Report is it alleged that plaintiffs were made aware that Thornton was to have any involvement with the partnerships.

▮▮▮▮ Section 10(b) and Rule 10b–5 apply to fraud "in connection with the sale or purchase" of securities. 15 U.S.C. § 78j(b); 17 C.F.R. 240.10b–5. While the "in connection with" phrase is construed broadly by the courts, *United States v. Newman,* 664 F.2d 12, 18 (2d Cir.1981), *cert. denied,* 464 U.S. 863, 104 S.Ct. 193, 78 L.Ed.2d 170 (1983), allegations of post-purchase activities alone are insufficient to establish liability as either a primary violator or an aider and abettor. *E.g. Huang v. Sentinel Government Securities,* 709 F.Supp. 1290, 1295 (S.D.N.Y.1989). *See also Schwartz v. Duckett,* 1989 WL 16054, 1989 U.S.Dist. LEXIS 1569 (S.D.N.Y. February 21, 1989) (bank's involvement in alleged fraud months after plaintiff initially invested did not meet "purchase or sale" requirement of section 10(b)).

▮▮▮▮ Plaintiffs have failed adequately to tie Thornton's activities to any primary violation of the securities laws. Substantial assistance in furtherance of the primary violation requires a showing that the aider and abettor was a causal factor of the primary violation. *See Edwards & Hanly v. Wells Fargo Securities Clearance Corp.,* 602 F.2d 478, 484 (2d Cir.1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980). In order to state a primary violation under section 10(b) in this Circuit, plaintiffs must plead loss causation and transaction causation. *See Wilson v. Ruffa & Hanover, P.C.,* 844 F.2d 81, 85 (1988), *aff'd on reconsideration,* 872 F.2d 1124 (2d Cir.1989). Loss causation concerns whether the misrepresentations or omissions the defendant allegedly committed caused the plaintiffs' economic harm, and transaction causation refers to whether the defendant's alleged violations caused the plaintiff to engage in the transaction in question. *Id.; Schlick v. Penn–Dixie Cement Corp.,* 507 F.2d 374, 380 (2d Cir.

---

**15.** Plaintiffs failure adequately to allege scienter on the part of Price Waterhouse or J.H. Cohn is fatal to their aiding and abetting claims against these defendants. *Griffin I,* ¶ 94,389 at 92,535.

1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). Inasmuch as plaintiffs had already completed their purchase of the limited partnership interests prior to Thornton's involvement with the partnerships, plaintiffs cannot allege that Thornton's activities "substantially assisted" defendants in perpetrating the primary fraud. *See Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943, n. 23 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); *Department of Economic Development v. Arthur Andersen & Co.,* 683 F.Supp. 1463, 1474–76 (S.D. N.Y.1988). *See also Beck v. Cantor, Fitzgerald & Co.,* 621 F.Supp. 1547, 1555 (N.D. Ill.1985) (accounting firm not liable as aider and abettor for misrepresentations and omissions which occurred after plaintiff purchased stock).

▪ Notwithstanding the completion of the sale of the limited partnership interests prior to Thornton's alleged involvement, plaintiffs claim that, as a result of Thornton's actions, they did not seek to rescind their agreements. This assertion, however, is insufficient to support a claim for aiding and abetting under the securities laws. *Department of Economic Development v. Arthur Andersen & Co., supra,* 683 F.Supp. at 1475–76 (the possibility of rescission, a latent remedy in any contract, does not determine when the purchase or sale of the security occurred).

Accordingly, plaintiffs have failed to state the elements of an aiding and abetting claim under the securities laws against Thornton, and this claim must be dismissed.

C. *Cautionary Language in the PPMs, Projections and Tax Opinions*

"To state a claim under Section 10(b), a complaint must allege material misstatements or omissions indicating an intent to deceive or defraud in connection with the purchase or sale of a security." *Luce v. Edelstein, supra,* 802 F.2d at 55. The

moving defendants, with the exception of Thornton, argue that, as a matter of law, the PPMs, tax opinions, and financial projections cannot support a claim of fraud because they contain cautionary language which warns the investors that the anticipated profits and tax benefits might not be achieved.

▪ In *Luce v. Edelstein, supra,* 802 F.2d at 56, the Second Circuit stated that it "was not inclined to impose liability" on the basis of statements in offering materials regarding financial projections of future cash flow and expected tax benefits, where the statements "clearly 'bespeak caution.'" Consequently, warnings and disclaimers may limit the extent to which an investor can rely on the offering documents as a forecast of future events. *Friedman v. Arizona World Nurseries, Ltd. Partnership,* 730 F.Supp. 521, 541 (S.D.N.Y.1990). Dismissal of securities fraud claims may be appropriate where the offering documents specifically warn plaintiffs not to rely on the alleged misrepresentations made by defendants, thus making any subsequent reliance unjustified. *Id.* at 536–41; *Feinman v. Schulman Berlin & Davis,* 677 F.Supp. 168, 171 (S.D.N.Y.1988); *Stevens v. Equidyne Extractive Industries 1980, Petro/Coal Program 1,* 694 F.Supp. 1057, 1066 (S.D.N.Y.1988).

The moving defendants contend that the offering materials contain explicit disclaimers which warned that the partnerships might not be profitable, that the anticipated tax benefits might not be realized and that the assumptions upon which the offering materials relied might fail to occur. They maintain that, as a matter of law, these disclaimers negate any inference of fraud.

▪ Plaintiffs, however, challenge more than just the future forecasts and predictions in the offering materials.[16] They argue that the underlying assumptions of the PPMs, tax opinions and projections were designed to mislead the inves-

---

**16.** Plaintiffs do seek to rely on certain predications as to future events, notably the predictions regarding the future price of oil, which fall within the category of future forecasts which

will not support liability where the offering materials contain clear and express cautionary language which advise the investors not to rely on such predictions.

tors into believing that the partnership investments offered them the opportunity to achieve a profit and a tax benefit from their investment, when in reality defendants knew that these possibilities did not exist because, among other things, of the nature of the properties upon which the partnerships were to drill, the expenses they would incur, and the financial structure of the operations. Inasmuch as certain of these allegations go to the misleading nature of the statements when made, the existence of cautionary language regarding the general unpredictability of, *inter alia*, oil and gas operations, economic trends, and the interpretation of the tax laws, will not bar plaintiffs from maintaining their claims against the remaining defendants. *See Jameson v. Prudential–Bache Securities*, 1990 WL 52197, 1990 U.S.Dist. LEXIS 4635 (S.D.N.Y. April 18, 1990). *See also CL–Alexanders Laing & Cruickshank v. Goldfeld*, 739 F.Supp. 158 (S.D.N.Y.1990).

## D. *The RICO Claim*

■ In plaintiffs' thirty-seventh claim for relief, they allege that all of the defendants participated in the conduct of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), and conspired to violate section 1962(c) in violation of 18 U.S.C. § 1962(d). S.A.C. ¶¶ 506–518; *see also RICO Case Statement*, filed May 22, 1989 (limiting relief sought to that under §§ 1962(c) and (d)).

> Section 1962(c) makes it unlawful
>
> for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity....

To state a cause of action under section 1962(c) a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co. Inc.*, 473 U.S. 479, 496, 105

S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985); *Procter and Gamble Co. v. Big Apple Industrial Bldgs., Inc.*, 879 F.2d 10, 14–15 (2d Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 723, 107 L.Ed.2d 743 (1990).

Under the RICO statute, an enterprise is defined as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Racketeering activity is the commission of certain predicate acts, defined to include, *inter alia*, fraud in the sale of securities, mail fraud, and wire fraud, 18 U.S.C. § 1961(1), and a pattern of racketeering activity requires "at least two acts of racketeering activity, ... the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

Various defendants have attacked the adequacy of plaintiffs' RICO claims, arguing that (1) the Second Amended Complaint fails to allege predicate acts to support a RICO violation, (2) the RICO claims are barred by the statute of limitations, and (3) plaintiffs have failed to allege an enterprise or a pattern of racketeering activity cognizable under the statute.

### 1. *Predicate Acts of Racketeering*

■ Plaintiffs allege each defendants committed two or more predicate acts of securities fraud, mail fraud, or wire fraud.[17] With respect to Crown, Wiener and Ruffa & Hanover, the Court has found that plaintiffs adequately asserted claims under the securities laws. Thus, they have pled a number of predicate acts of securities violations for these defendants sufficient to satisfy this initial requirement under RICO. *See United States v. Kaplan*, 886 F.2d 536, 541–42 (2d Cir.1989) (bribes offered to two persons in the same conversation stated two predicate acts); *Beauford v. Helmsley*, 865 F.2d 1386, 1391–92 (2d Cir.1989) (*en banc*), *vacated for further consideration in light of H.J. Inc.*,

---

**17.** Although plaintiffs allege predicate acts of wire fraud, they do not specify any such wire transmissions. Accordingly, the wire fraud allegations are clearly insufficient to support any predicate acts.

— U.S. ——, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989), *aff'd on reconsideration*, 893 F.2d 1433 (2d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989).

The RICO claims against Price Waterhouse and J.H. Cohn must be dismissed, however, as the Court has concluded that plaintiffs have failed to state adequately a claim for fraud, including securities fraud, mail fraud and wire fraud, *see Beck v. Manufacturers Hanover Trust Co., supra*, 820 F.2d at 49–50, and they have similarly failed to allege any agreement involving these defendants to support a conspiracy accusation. *See Friedman v. Arizona World Nurseries Ltd. Partnership, supra*, 730 F.Supp. at 548–49; *Department of Economic Development v. Arthur Andersen & Co., supra*, 683 F.Supp. at 1482.

■■■ The RICO claim against Thornton stands on a different footing, however, to the extent the Court, in concluding that plaintiffs had failed to allege any security fraud violations, did not consider whether plaintiffs had alleged predicate acts of mail fraud. In order to state a claim of mail fraud, plaintiffs must allege (1) the existence of a scheme to defraud, (2) defendant's knowing or intentional participation in that scheme, and (3) use of the interstate mails in furtherance of the scheme. *See Beck v. Manufacturers Hanover Trust Co., supra*, 820 F.2d at 49. The Court need not decide whether plaintiffs have adequately alleged predicate acts of mail fraud by Thornton, however, as the RICO claim asserted against it is, in any event, barred by the statute of limitations.[18]

### 2. *Statute of Limitations*

■■■ In *Agency Holding Corp. v. Malley–Duff & Associates, Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), the Supreme Court determined that a four year limitations period is applicable to civil RICO claims. The statute of limitations

begins to run from the time plaintiffs discovered, or should have discovered, their injury. *E.g. Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989). On a motion to dismiss, when the facts alleged in the complaint indicate that, with reasonable diligence, plaintiffs should have uncovered the alleged fraud prior to the limitations period, the claim will be time-barred. *See Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir.1983).

Plaintiffs who invested in the 1982 partnerships purchased their interests during the course of 1982. Likewise, the investments in the 1983 partnerships all occurred during 1983. The original complaint in this action was not filed until January 26, 1988, more than four years after the transactions in question. Still, plaintiffs argue that the RICO claim is timely because they could not have uncovered the fraud prior to receiving reports from the Internal Revenue Service in 1987 advising them that the tax deductions would be denied in large measure because the partnerships had not been organized to generate a profit.

With respect to the 1983 partnerships, the Second Amended Complaint does not indicate that plaintiffs should have discovered the fraudulent acts prior to the end of January 1984. Therefore, the Court cannot conclude, on the basis of the pleading alone, that these claims are time-barred.

As for the 1982 partnerships, plaintiffs conveniently ignore their own arguments, put forth forcefully in connection with their allegations of Thornton's involvement with the fraud, that the withdrawal of the reports and tax opinions by Price Waterhouse and Wiener in February 1983 was at least sufficient to provide notice that a further investigation into the activities of the partnerships was necessary.

*Plains/Anadarko–P Ltd. Partnership v. Coopers & Lybrand*, 658 F.Supp. 238, 240 (S.D.N.Y.1987) (emphasis in the original); *Accord Goldman v. McMahan, Brafman, Morgan & Co.*, 706 F.Supp. 256, 261–62 (S.D.N.Y.1989). Such is the case with the allegations levelled at Thornton.

---

**18.** In addition, it has been held that the "federal statutory requirement that an enterprise be *conducted* by the accused accountants is not satisfied when a professional accountant enters into an engagement of finite duration and scope, undertaken for a particular client."

**1256**

In February 1983, the plaintiffs in the 1982 partnerships were informed that there was a possibility that (1) the original geology reports had significantly overstated the oil reserves, (2) there were questions as to the authorship of the geologist's reports, and (3) the Internal Revenue Service was likely to find that the tax deductions were improper. Exhibit I annexed to S.A.C. At that time, plaintiffs were made aware that the unfavorable estimates regarding the oil reserves were based on the findings of an independent engineering firm, and that the concerns over the economics of the partnerships were serious enough to have resulted in the withdrawal of Price Waterhouse and Wiener.[19] Thus, plaintiffs were on inquiry notice of the alleged fraud upon being informed of the withdrawals in February 1983, more than four years prior to filing their complaint. *See Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1411, 1415–16 (9th Cir.1987) (notice to plaintiffs of deficiency in coal reserves and questions by IRS as to the commercial viability of partnership's business and, therefore, the validity of the certain tax deductions, was sufficient to put plaintiffs on inquiry notice of the alleged fraudulent acts, notwithstanding that the IRS did not disallow the deductions for a number of years).

Plaintiffs maintain that they did not discover the fraud due to the fraudulent concealment of certain defendants, namely Wycombe and McNiff, who criticized the reasons behind the withdrawals in the Special Report and informed them that Thornton had agreed to replace Price Waterhouse and prepare the partnerships' tax returns.

■ In seeking to toll the statute of limitations through allegations of fraudulent concealment, plaintiffs bear the burden to plead with particularity "(1) the wrongful concealment by the defendant of its actions, (2) the failure by the plaintiff to discover the operative facts underlying the action within the limitations period, and (3) the plaintiff's due diligence to discover the facts." *Donahue v. Pendleton Woolen Mills, Inc.*, 633 F.Supp. 1423, 1443 (S.D.N.Y.1986). The limitations period will not be tolled if plaintiffs had a reasonable basis to suspect a wrong, yet failed to exercise due diligence to investigate the matter. *Id.*

■ Just as plaintiffs argue that the notification of the facts concerning the withdrawal required Thornton to further investigate the partnerships, notwithstanding the assurances from the general partners, so too did these facts require plaintiffs to further investigate the acts they now claim constitute fraud. Inasmuch as plaintiffs were put on inquiry notice from the withdrawals, they may not rely on allegations of fraudulent concealment to avoid the limitations bar unless they exercised due diligence in attempting to ascertain the facts related to the alleged fraud, but were nevertheless unable or prevented from discovering the nature of their claim. *See Volk v. D.A. Davidson & Co., supra,* 816 F.2d at 1415–16. *Accord Freschi v. Grand Coal Venture,* 767 F.2d 1041, 1046 n. 7 (2d Cir.1985), *vacated on other grounds,* 478 U.S. 1015, 106 S.Ct. 3325, 92 L.Ed.2d 731 (1986); *Bender v. Rocky Mountain Drilling Associates,* 648 F.Supp. 330, 334–35 (D.D.C.1986). Plaintiffs have wholly failed to allege that they did anything to investigate the possibility of fraud.[20] Accordingly, the RICO claim concerning the 1982 partnerships is barred by the four year statute of limitations.

Ruffa & Hanover, the remaining movant involved in the 1983 partnerships, argues that the RICO claim relating to the 1983 partnerships fails to state an enterprise or a pattern of racketeering activity.

---

**19.** These concerns, according to plaintiffs, all turned out to be true, and it is substantially these facts upon which plaintiffs predicate their claims of fraud.

**20.** In addition, the doctrine of fraudulent concealment tolls the statute of limitations only as to those defendants who committed the concealment, and plaintiffs may not generally use the fraudulent concealment by one defendant as a means to toll the statute of limitations against other defendants. *See O'Brien v. National Property Analysts Partners,* 719 F.Supp. 222, 232 (S.D.N.Y.1989); *Bingham v. Zolt,* 683 F.Supp. 965, 975 (S.D.N.Y.1988); *Greenfield v. Kanwit,* 87 F.R.D. 129, 132 (S.D.N.Y.1980).

### 3. The "Enterprise" Element

 A RICO enterprise is generally a group of persons associated together for a common purpose of engaging in a course of conduct. *Procter & Gamble Co. v. Big Apple Industrial Bldgs., Inc., supra,* 879 F.2d at 15. Evidence of an ongoing organization, the associates of which function as a continuing unit, suffices to prove an enterprise. *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981). Plaintiffs have alleged that defendants, in various combinations, associated in an ongoing organization to sell interests in an unlimited series of limited partnerships. This association was "engaged in the business of oil and gas exploration, the drilling and operation of oil and gas fields and the promotion, sale and distribution of interests in the limited partnerships which developed, drilled and operated the oil and gas fields." RICO Case Statement, *supra,* at ¶ 9. Ruffa and Hanover is alleged to be part of the enterprise as a result of its preparation of the fraudulent PPMs and the financial interest in the partnerships held by Ruffa, its senior partner. These allegations are sufficient to satisfy the "enterprise" element under RICO. *See Shumate v. McNiff, supra,* 1990 WL 6549, 1990 U.S.Dist. LEXIS 547 at 12.

### 4. The "Pattern" Element

In *H.J. Inc. v. Northwestern Bell Telephone Co.,* —— U.S. ——, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989), the Supreme Court attempted to clarify RICO's pattern requirement and resolve at least some of the discrepancies in interpretation of the pattern element among the Circuit Courts.

 In order to prove a pattern of racketeering activity a plaintiff must show that the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity. *Id.* 109 S.Ct. at 2900. Multiple illegal schemes are not necessary to form a pattern. *Id.* at 2899. *See also Beauford v. Helmsley, supra,* 865

F.2d at 1391 (the Second Circuit, foreshadowing *H.J. Inc.,* rejected its prior practice of requiring "relatedness" and "continuity" in the enterprise element, shifting these requirements to the pattern element).[21]

The relationship component of a pattern of racketeering activity is satisfied by " 'criminal conduct ... [which] embraces criminal acts that have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *H.J. Inc. v. Northwestern Bell Telephone Co., supra,* 109 S.Ct. at 2901 (quoting 18 U.S.C. § 3575(e) (partially repealed)).

The continuity component of a pattern of racketeering activity is satisfied by plaintiff proving "continuity of racketeering activity, or its threat, *simpliciter.*" *Id.* at 2901.

> 'Continuity' is both a closed and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition ... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of closed predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement. Congress was concerned in RICO with long-term criminal conduct.

*Id.* at 2902.

 In order to state a RICO claim, a plaintiff must plead a basis from which to infer that the alleged acts of racketeering activity were neither isolated nor sporadic. *Procter & Gamble v. Big Apple Industrial Bldgs., Inc., supra,* 879 F.2d at 18; *Beauford v. Helmsley, supra,* 865 F.2d at 1391.

 Plaintiffs have alleged that defendants carried out the affairs of the enterprise through a scheme to defraud plain-

---

**21.** In *Beauford,* the Second Circuit acknowledged that its reframing of the pattern element of RICO would allow many more civil RICO cases to proceed than had the Circuit's previous interpretations, but concluded that this liberal approach was required by the statute. *Beauford v. Helmsley, supra,* 865 F.2d at 1393.

tiffs which continued, in one form or another, over a number of years. During this period, plaintiffs have alleged that defendants committed various acts of securities fraud and mail fraud, and that these fraudulent acts were defendants' regular way of forming and issuing interests in the partnerships. At this preliminary stage in the litigation, such allegations suffice to state a pattern of racketeering activity, and the Court declines to dismiss the remaining RICO claims involving Ruffa & Hanover. *See Shumate v. McNiff, supra,* 1990 WL 6549, 1990 U.S.Dist. LEXIS 547 at 12. *See also Friedman v. Arizona World Nurseries Ltd., supra,* 730 F.Supp. at 548.

### E. Leave to Replead the Fraud Claims Dismissed Under Rule 9(b)

In *Griffin I,* after the Court had found plaintiffs allegations of fraud insufficient, they were given leave to replead as is customary in an initial dismissal for failure to comply with Rule 9(b). *See Luce v. Edelstein, supra,* 802 F.2d at 56. The Court, in its prior decision, highlighted the numerous inadequacies of the First Amended Complaint and specified that plaintiffs replead only if they believed in good faith that they could cure these deficiencies. Nevertheless, plaintiffs' third attempt to plead fraud against Price Waterhouse and J.H. Cohn suffers from the same absence of factual allegations as the previous pleadings.[22] Moreover, plaintiffs' approach in repleading the claims against these defendants, including misleading cross-references and overwhelming verbiage, suggest to the Court that any additional pleading would not be fruitful. Inasmuch as plaintiffs have been given ample opportunity to plead their claims properly, yet have failed to do so, dismissal with prejudice is justified. *See Armstrong v. McAlpin, supra,* 699 F.2d at 93–94 (fourth attempt to replead claims denied); *Decker v. Massey–Ferguson, Ltd, supra,* 681 F.2d at 114–15 (third attempt to replead claims denied);

*Denny v. Barber,* 576 F.2d 465, 470–71 (2d Cir.1978) (same); *Friedman v. Arizona World Nurseries Ltd., supra,* 730 F.Supp. at 551 (same). Accordingly, the fraud claims against Price Waterhouse and J.H. Cohn are dismissed with prejudice.

### F. The State Law Claims Against the Accounting Firms

The dismissal of the federal claims against Price Waterhouse, J.H. Cohn and Thornton removes the basis for federal jurisdiction over the remaining pendent state law claim for negligence. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 2009–10, 104 L.Ed.2d 593 (1989) (pendent party jurisdiction not permissible in cases arising under the Federal Tort Claims Act). *See also Staffer v. Bouchard Transportation Co.,* 878 F.2d 638, 643 n. 5 (2d Cir.1989) (expressing doubts about the continued validity of pendent party jurisdiction after *Finley* ). In the Court's view, the dismissal of the claims supplying the basis for jurisdiction at this early point in the litigation warrants dismissal of the remaining state law claims. Therefore, the claims for negligence and, to the extent it remains viable, the claim for common law fraud against Thornton, are dismissed for lack of subject matter jurisdiction.

### CONCLUSION

The motions of Price Waterhouse, J.H. Cohn, and Thornton to dismiss are granted and the Second Amended Complaint is dismissed against them. The motions of Crown and Wiener to dismiss are granted in part and denied in part, to the extent that the RICO claims asserted concerning the 1982 partnerships are dismissed as being barred by the statute of limitations. The motion of Ruffa & Hanover is denied in its entirety. The parties are directed to

---

**22.** While J.H. Cohn's request that the Court impose Rule 11 sanctions has some merit based on the lack of factual specificity in the pleading, the manner in which plaintiffs presented their merger allegations, and the Court's previous ad-

monitions concerning the requirements of Rule 11, the Court is not prepared to find a violation of Rule 11 based on the current submissions. *See generally, Mareno v. Rowe,* 910 F.2d 1043, 1046 (2d Cir.1990).

complete discovery by February 14, 1991 and file a pre-trial order by March 14, 1991.

It is so ordered.